**No. 14-10857**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

RALPH S. JANVEY,

Plaintiff - Appellee

v.

JAMES R. ALGUIRE; VICTORIA ANCTIL; TIFFANY ANGELLE; SYLVIA AQUINO; JONATHAN BARRACK; MARK TIDWELL; CHARLES RAWL; SUSANA ANGUIANO; TERAL BENNETT; LORI BENSING; SUSANA CISNEROS; RON CLAYTON; JOHN D. ORCUTT, et al.,

Defendants – Appellants

---

CONSOLIDATED WITH 14-10945

RALPH S. JANVEY, in his capacity as Court-Appointed Receiver for the Stanford International Bank, Limited, et al.,

Plaintiff - Appellee

v.

ORESTE TONARELLI,

Defendant - Appellant

---

CONSOLIDATED WITH 14-11014

RALPH S. JANVEY, in his capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al.,

Plaintiff - Appellee

v.

Juan Alberto Rincon,

Defendant – Appellant

---

CONSOLIDATED WITH 14-11093

RALPH S. JANVEY, in his capacity as Court-Appointed Receiver for the Stanford International Bank, Limited et al.; OFFICIAL STANFORD INVESTORS COMMITTEE,

Plaintiffs - Appellees

v.

LUIS GIUSTI,

Defendant - Appellant

---

On Appeal From the United States District Court for the
Northern District of Texas, Dallas Division, Civil Action Nos. 3:09-CV-724,
3:10-CV-1955, 3:11-CV-1659, 3:11-CV-292

---

# APPELLANTS' PETITION FOR REHEARING *EN BANC*

---


Bradley W. Foster
Matthew G. Nielsen
ANDREWS KURTH LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone: (214) 659-4400
Facsimile: (214) 659-4401

**ATTORNEYS FOR THE ALGUIRE APPELLANTS**
**(115 FA DEFENDANTS)**

Jason Wayne Graham
Theodore Brandon Welch
Graham & Jensen, L.L.P.
17 Executive Park Drive, Suite 115
(404) 842-9380 (Telephone)
(678) 904-3110 (Facsimile)

**ATTORNEYS FOR APPELLANTS**
**STEVE SLEWITZKE, ET AL.**

Michael John Stanley
Stanley, Frank & Rose, L.L.P.
7026 Old Katy Road
Houston, Texas 77024
(713) 980-4381 (Telephone)
(713) 980-1179 (Facsimile)

**ATTORNEY FOR APPELLANTS SUSANA ANGUIANO, ET AL.; JUAN A. RINCON; AND LUIS GIUSTI**

Walter Perry Zivley, Jr.
Chandler, Mathis & Zivley, P.C.
601 Sawyer, Suite 600
Houston, Texas 77007
(713) 739-7722 (Telephone)
(713) 739-0922 (Facsimile)

**ATTORNEYS FOR APPELLANTS DAVID WAYNE KRUMREY, ET AL.**

Carolyn R. Raines
Godwin Bowman & Martinez PC
1201 Elm Street, Suite 1700
Renaissance Tower
Dallas, Texas 75270
(214) 939-4452 (Telephone)
(214) 527-3137 (Facsimile)

**ATTORNEYS FOR APPELLANT JOHN D. ORCUTT**

Michael L. O'Brien
Mike O'Brien P.C.
14355 Highway 105
Washington, Texas 77880
(713) 222-0088 (Telephone)
(713) 222-0888 (Facsimile)

**ATTORNEYS FOR APPELLANT CHARLES RAWL**

Monroe David Bryant, Jr.
Dykema Cox Smith
1201 Elm Street, Suite 3300
Renaissance Tower
Dallas, Texas 75270
(214) 698-7800 (Telephone)
(214) 698-7899 (Facsimile)

Mark Joseph Barrera
Dykema Cox Smith
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
(210) 554-5314 (Telephone)
(210) 226-8395 (Facsimile)

**ATTORNEYS FOR APPELLANT**
**ORESTE TONARELLI**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Ralph S. Janvey
Krage & Janvey, L.L.P.
2100 Ross Avenue, Suite 2600
Dallas, TX 75201

Court-appointed receiver for the Stanford Receivership Estate

Kevin M. Sadler
David T. Arlington
Scott D. Powers
Stephanie F. Cagniart
Baker Botts LLP
1500 San Jacinto Center
98 San Jacinto Boulevard
Austin, Texas 78701-4078

Timothy S. Durst
Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, Texas 75201-2980

Ben L. Krage, Esq.
Krage & Janvey, L.L.P.
2100 Ross Avenue, Suite 2600
Dallas, TX 75201

Attorneys for Receiver Ralph S. Janvey

Bradley W. Foster
Matthew G. Nielsen
Andrews Kurth LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201

Attorneys for Jim Alguire, Orlando Amaya, Victoria Anctil, Tiffany Angelle (Degeyter), Sylvia Aquino, George Arnold, Mike Arthur, Donal Bahrenburg, Brown Baine, Stephen Barber, John Barrack, Andrea Berger (Freedman), Norman Blake, Michael Bober, Nigel Bowman, Alexandre Braune, Nancy Brownlee, George Cairnes, Frank Carpin, Scott Chaisson, Neal Clement, Jay Comeaux, Michael Conrad, John Cravens, Patrick Cruickshank, Greg Day, Bill Decker, Mike DeGolier, Arturo Diaz, Tom Espy, Jason Fair, Evan Farrell, Roger Fuller, Attlee Gaal, Gregg Gelber, Michael Gifford, Steven Glasgow, John Glennon, Ward Good, Stephen Greenhaw, Billy Ray Gross, Patricia Herr, John Mark Holliday, Charles Hughes, Wiley Carter Hutchins, Jr., David Innes, Allen Johnson, Bruce Lang, Jim LeBaron, Bill Leighton, Robert (Bobby) Lenoir, Trevor Ling, Chris Long, Robert Long, Humberto Lopez, Michael Macdonald, Maria Manerba, Mike Mansur, Bert “Deems” May, Doug McDaniel, Matt McDaniel, Pamela McGowan, Lawrence Messina, Bill Metzinger, Trent Miller, Peter Montalbano, David Morgan, Jonathan Mote, Carroll Mullis, Jon Nee, Aaron Nelson, Norbert Nieuw, Scott Notowich, Monica Novitsky, Bill Peerman, Saraminta Perez, Randy Pickett, Edward Prieto, Christopher Prindle, Andrew Pritsios, Judith Quinones, Sumeet Rai, Michael Ralby, Nelson Ramirez, Steven Restifo, Jeff Ricks, Alan Riffle, Steve Robinson, Eddie Rollins, Rocky Roys, John Santi, Bill Scott, Haygood Seawell, Leonard Seawell IV, Doug Shaw, Paul Stanley, Sandy Steinberg, David Heath Stephens, William O. Stone, Jr., Paula Sutton, Brent Sutton, Scot Thigpen, Jose Torres, Al Trullenque, Audrey Truman, Roberto Ulloa, Tim Vanderver, Pete Vargas, Ed Ventrice, Maria Villanueva, Charles Vollmer, Bill Whitaker, Donald Whitley, Hunter Widener, and Tom Woolsey (collectively referred to as the “Alguire Appellants”)

David B. Reece
U.S. Securities & Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, TX 76248

Attorneys for the U.S. Securities & Exchange Commission

John J. Little
Little Pedersen Fankhauser LLP
901 Main Street, Suite 4110
Dallas, TX 75202

Court-appointed Examiner for the Stanford Receivership Estate

Edward C. Snyder
Castillo Snyder, P.C.
300 Convent Street, Suite 1020
Bank of America Plaza
San Antonio, TX 78205

Peter D. Morgenstern
Butzel Long PC
230 Park Avenue, Suite 850
New York, NY 10169

Edward F. Valdespino
Strasburger & Price
300 Convent St., Suite 900
San Antonio, TX 78205

Attorney for Official Stanford Investors Committee

Michael L. O'Brien
Mike O'Brien P.C.
14355 Highway 105, Suite1000
Washington, TX 77880

Attorneys for Charles Rawl

Kim Bernard Battaglini
Strong Pipkin Bissell &
Ledyard, L.L.P.
Suite 1200
4900 Woodway Drive
Houston, TX 77056

Attorneys for Mark Tidwell

Michael John Stanley
Stanley, Frank & Rose, L.L.P.
7026 Old Katy Road
Houston, TX 77024

Attorneys for Susana Anguiano, Teral Bennett, Lori Bensing, Susana Cisneros, Ronald Clayton, Raymond Deragon, James Fontenot, Miguel Garces, Mark Groesbeck, Rodney Hadfield, Gary Haindel, Dirk Harris, Steven Hoffman, Charles Jantzi, Grady Layfield, Jason Leblanc, Anthony Makransky, Claudia Martinez, Janie Martinez, Aymeric Martinoia, Carol Mcann, Gerardo Meave, Donald Miller, Hank Mills, Rolando Mora, Shawn Morgan, Spencer Murchison, Lupe Northam, Timothy Parson, James D. Perry, Louis Perry, John Schwab, Brent Simmons, Steve Slewitzke, Chris Thomas, Miguel Valdez, David Whittemore, Michael Word, Ryan Wrobleske, Juan Alberto Rincon, and Luis Guisti

John C. Porter, Jr., Esq.
Brian N. Smiley
Smiley Bishop & Porter, L.L.P.
1050 Crown Pointe Parkway
Atlanta, GA 30338

Robert Lee Wright
Wright & Berry
612 8th Avenue
Fort Worth, TX 76104

Attorneys for Alan Brookshire, James C. Chandley, David Braxton Gray, Gregory C. Gibson, John Grear, Jason Likens, Kale Olsen, Timothy D. Rogers, John Whitfield Wilks

Carolyn R. Raines, Esq.
Godwin Bowman & Martinez PC
1201 Elm Street, Suite 1700
Dallas, Texas 75270

Attorney for John D. Orcutt

Jason W. Graham
T. Brandon Welch
Graham & Jensen, L.L.P.

17 Executive Park Drive, Suite 115
Atlanta, GA 30329

Attorneys for Steve Slewitzke, Brad Bradham, Nolan Farhy, Virgil Harris, Louis Schaufele, Eric Urena, Blanca Fernandez, Nancy J. Huggins

Walter Perry Zivley, Jr.
Chandler, Mathis & Zivley, P.C.
601 Sawyer, Suite 600
Houston, TX 77007

Attorneys for David Wayne Krumrey and Randolph E. Robertson

David Bryant, Jr.
Mark Joseph Barrera
Dykema Cox Smith
1201 Elm Street, Suite 300
Renaissance Tower
Dallas, Texas 75270

Attorney for Oreste Tonarelli

J. P. Morgan Clearing Corp
One Metrotech Center North
Brooklyn, NY 11201-3859

Held or currently holds SCG customer and former employee accounts

Gene R. Besen
Dentons US LLP
2000 McKinney Avenue, Suite 1900
Dallas, Texas 75201

Attorney for Jeffrey E. Adams, Johnny David Damon, Timothy W. Baughman and Thomas G. Rudkin

Robert L. Wright
Robert L. Wright, P.C.
612 Eighth Avenue
Fort Worth, Texas 76104

Attorney for Louis Schaufele

Ross D. Kennedy
Bracewell & Giuliana LLP
711 Louisiana, Suite 2300
Houston, TX 77002

Attorney for Patricia A. Thomas

John Timothy Byrd
Smyser Kaplan & Veselka, L.L.P.
700 Louisiana, Suite 2300
Houston, Texas 77002

Attorney for Defendant Zack Parrish

James M. Reed
John T. Richer
Hall Estill Hardwick Gable Golden & Nelson P.C.
320 South Boston Avenue, Suite 200
Tulsa, Oklahoma 74103-3706

Attorneys for James Weller

James S. Annelin
Annelin & Gaskin
7 Switchbud Place, Suite 271
The Woodlands, TX 77380

Attorneys for HMS&B, Ltd.

William M. Lamoreaux
900 Jackson Street, Suite 180
Dallas, Texas 75202

Attorney for Jordan M. Estra

M. David Bryant, Jr.
Mark Joseph Barrera
Dykema Cox Smith
1201 Elm Street, Suite 3300
Dallas, TX 75270

Andrew J. Petrie
Ballard Spahr LLP
1225 Seventeenth Street, Suite 2300
Denver, CO 80202

Attorneys for GMAG, LLC, Gary D. Magness Irrevocable Trust, Magness Securities, LLC

John P. Kincade
Winstead PC
800 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201

Attorney for Jason Green

Leila M. El-Hakam
Matias J. Adrogue PLLC
440 Louisiana, Suite 715
Houston, TX 77002

Attorney for Donna Guerrero

Laura Gibson
Linda Broocks
Ogden, Gibson, Broocks Longoria & Hall LLP
711 Louisiana, Suite 1900
Houston, Texas 77002

Leila M. El-Hakam
Matias J. Adrogue PLLC
440 Louisiana, Suite 715
Houston, TX 77002

Attorneys for Gustavo A. Garcia, Robert A. Kramer, James F. Anthony, Helena M. Herrero, Nicholas P. Salas, Juan C. Riera, Giampiero Riccio, Kelley L. Hawkins, Lori Fischer, Juliana Franco, Michael Contorno, Jane E. Bates and Susan K. Jurica

Marc C. Tecce
Fitzpatrick Hagood Smith & Uhl LLP
2515 McKinney Avenue, Suite 1400
Dallas, Texas 75201

Attorney for Tony Perez and Manuel Malvaez

Elaine Conway Becraft
LyondellBasell
1221 McKinney St., Suite 700
Houston, Texas 77010

Attorneys for Timothy Johnson

Tricia R. DeLeon
Janelle S. Forteza
Bracewell & Giuliani LLP
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202-2711

Attorneys for Kathleen Reed, Megan Malanga, Timothy W. Summers, Carter W. Driscoll and Jon C. Shipman

William S. Chesney, III
Frank Elmore Lievens Chesney & Turet, L.L.P.
808 Travis Street, Suite 2600
Houston, TX 77002-5705

Attorneys for Robert Hogue and Nolan N. Metzger

T. B. Nicholas, Jr.
Downs & Stanford, P.C.
2001 Bryan Street
Suite 4000
Dallas, TX 75201

Attorney for Syed Razvi

Thomas M. Hobson
Hobson Law Firm LLC
1083 Walnut Street
Centreville, Al 35042

Attorney for Donna M. Vines

H. Stephen Brown
The Brown Law Firm PLC
850 Ridge Lake Blvd, Suite 300
Memphis, TN 38120

John Morant Cone
Hitchcock Everet LLP
750 N St. Paul St, Suite 1110
Dallas, TX 75201

Attorneys for Larry Goldsmith

Allyson N. Ho
Jeffrey J. Chomko
Dennis C. Dice
Marshall Dennehey Warner
Coleman & Goggin
1845 Walnut St, 17th Floor
Philadelphia, PA 19103

Elizabeth Hoop Fay
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103

Attorneys for SEI Private Trust Company

Ernest W. Leonard
Freidman & Feiger LLP
5301 Spring Valley Road, Suite 200
Dallas, TX 75254

Attorney for Plateau Telecommunications, Inc.

Kevin H Good
Curtis C Graves
Conner & Winters LLP
1700 Pacific LLP, Suite 2250
Dallas, TX 75201

Attorney for Gary Lieberman

James B Greer
Randall Greer, PLLC
3100 Monticello Avenue, Suite 725
Dallas, TX 75205

Joseph A. Hummel
Kenneth C. Johnston
Kane Russell Coleman & Logan PC
1601 Elm St, Suite 3700
Dallas, TX 75201

Attorney for Regions Bank, as Trustee for LPFA II City Plaza Project Series 2008 and II City Plaza LLC

Patricia Hair
Phelps Dunbar LLP
500 Dallas, Suite 1300
Houston, TX 77002

Dan Zimmerman
Bruce V Schewe
Phelps Dunbar LLP
365 Canal Street, Suite 2000
New Orleans, LA 70801

Attorneys for Ross D. Bruce

Michael J. Quilling
Brent J. Rodine
Quilling Selander Lownds Winslett
& Moser PC
2001 Bryan Street, Suite 1800
Dallas, TX 75201

Attorneys for Daniel Joseph Daigle, Jilda Ann Daigle, Tarral E. Daigle, Alice . Greer, Robert S. Greer, Jeff P. Purpera, Jr., and Thomas Turner

Phillip W. Preis
Preis Gordon APLC
450 Laurel Street, Suite 2150
Baton Rouge, LA 70801

Attorney for BBRATSS Productions, Inc., Jodie F. Crawford, Robert B. Crawford, Jr., Kenneth Dougherty, William E. Ensminger, Betty Jo Forshag, Clarence H. Forshag, Emma Lee Lefedvre, Charlie L. Massey, Peggy Payne Moragne, Monty Perkins, Timothy Russell Ricketts, Michael A. Speeg, and Emolyn L. Watts

Kendall Kelly Hayden
Cozen O'Connor
1717 Main Street, 3400
Dallas, TX 75201

Attorneys for James R. Lawson

Kimberly A Lucas
Kyle Mathis & Lucas LLP
8226 Douglas Ave, Suite 450
Dallas, TX 75225

Judith P Rodden
Pozzuolo Rodden PC
2033 Walnut Street
Philadelphia, PA 19103

Attorney for Gold Wing Partners

Kerry C. Peterson
Matthew D. Rinaldi
Luis G. Zambrano
Miller Egan Molter & Nelson LLP
2911 Turtle Creek Blvd., Suite 1100
Dallas, TX 75201

Attorneys for Patricio Atkinson

Uttam Dhillon
Fitzpatrick Haygood Smith & Uhl LLP
2515 McKinney Ave., Suite 1400
Dallas, TX 75201

Attorney for Manuel Malvaez

Lawrence C. McCardle
Benjamin D. Reichard
James R. Swanson
Fishman Haygood Phelps Walmsley Willis & Swanson LLP
201 St Charles Ave, 46th Floor
New Orleans, LA 70170-4600

Attorney for Gail G. Marquette and Numa L. Marquette

Brian J, Tagtmeier
Hrbacek & Gandhi PC
130 Industrial Boulevard, Suite 110
Sugar Land, TX 77478

Attorney for Charles Lee Brickey

H. William Allen
Brooks C White
Allen Law Firm PC
212 Center St, 9th Floor
Little Rock, AR 72201

Attorney for Bobby G Wilkerson

Alicia G. Curran
Cozen O'Connor
1717 Main Street, Suite 3400
Dallas, TX 75201

Attorney for Dolores May Payer Rollar and George Joseph Rollar

Ashlea Brown
Newland & Associates PLLC
2228 Cottondale Lane, Suite 200
Little Rock, AR 72202

Attorney for Hannah Kay Peck

Brent J. Rodine
Quilling Selander Lownds Winslett & Moser PC
2001 Bryan Street, Suite 1800
Dallas, TX 75201

Attorney for Edgar Theron Overland and Archie Smith

Michael J. Quilling
Brent J. Rodine
Quilling Selander Lownds Winslett & Moser PC
2001 Bryan Street, Suite 1800
Dallas, TX 75201

Attorneys for Gaines D. Adams, Patricia A. Allison, Clyde Anderson, Diana B. Annison, George Bur Annison, George B. Annison, Trustee, Barbara Anthony, Michael S. Asmer, Azalea Rest Cemetery Inc., Azalea Rest Cemetery Inc. Irrevocable Trust, James W. Boring, Jr., Dennis Childress, John D. Cooper, Country Hill Investment, N.A., Daneco B.V., Richard A. Devall, Sue M. Devall, Michael J. Drago, Diane Dunn, DVX Capital, George R. Graves, III, Sandra F. Harrell, Michael R. Holcomb, John R. Holguin, Robert A. Houston, IRM Investments, Inc., Phillip E. Lankford, Jr., Audrey Letard, John O. Letard, Lyda D. Tymiak Family Trust, Phillip E. Marette, Dot. G. Melder, Jack W. Melder, Herman J. Milligan, Jr., Mississippi Polymers, Inc., J. Russell Mothershed, Murfield Investments, Inc., Francis Nezianya, Angelo Delio Nieuw, Maria P.C. Nieuw-Cael,

Geneva Sue Palmer, Robert E. Palmer, Anthony G. Parker, Ronald W. Parker, Juanita Quinealty, Charles E. Smith, Robert Soule, Stichting Particulier Fonds El Tributo, John E. Taylor, The Estate of James D. Simmons, The Second Amended and Restated Robert A. Houston Revocable Trust, The Steven James Antinori Irrevocable Trust, Eric Tucker, Jennifer Tucker, Judy Varnado, Edith Irma Watts, Gary Wood, Dorothy M. Young, and Robert Young Jr.

Charles M. Gordon
Phillip W. Preis
Preis Gordon APLCA
450 Laurel Street
Baton Rouge, LA 70821

Attorneys for Joseph Becker, Terry Beven, Kenneth Bird, James Brown, Murphy Buell, John C. Buscheme, John B. Buscheme, Virginia Buscheme, Robert Bush, Gene Causey, Joseph Chustz, Darrell Courville, William Dawson, Deborah Dougherty, Gwen Fabre, Joan Feucht, Richard Feucht, Deborah Forbes, Kendall Forbes, Lynn Gildersleeve, Robert V. Gildersleeve, Willa Mae Gildersleeve, Gordon C. Gill, Jason Graham, Robert Graham, Benton B. Johnson, Martha Johnson, William Bruce Johnson, Dennis Kirby, Kerry R. Kling, Teresa Michelle Lamke, Don Landers, Laura Lee, Troy Lillie, Ron Marsten, Susan Marsten, Billie Ruth McMorris, Ronald McMorris, Virginia McMorris, Thomas Moran, Bennie O'Rear, Claudia O'Rear, Mary Ann Paternostro, Larry Perkins, Charles Sanchez, Mamie Sanchez, Jennifer Savoic, Thomas Slaughter, Larry Smith, Carol Stegall, James Stegall, Bruce Stone, Walter Stone, Terry Tullis, Ron Valentine, Olivia Sue Warnock, Arthur Waxley, Kenneth Wilkewitz, Martha Witmer, Sharon Witmer, Arthur Ordoyne

Elaine C. Becraft
LyondellBassell
1221 McKinney Street, Suite 700
Houston, TX 77010

Attorney for Timothy Johnson

Cheryl E. Diaz
Culhane Meadows PLLC
100 Crescent Court, Suite 700
Dallas, TX 75201

Jay E. Ray
4900 South Lake Forrest Drive, Suite 300
McKinney, TX 75070

Attorneys for Henry A. Mentz, III, David Topp, Dora Topp, Risia Topp Wine

Daniel J. Fetterman
Adam K. Grant
David Mark
Kasowitz Benson Torres & Friedman LLP
1633 Broadway
New York, NY 10019

Scott Snellings
The Burress Snellings Law Firm PLLC
6617 Virginia Parkway
McKinney, TX 75071

Attorneys for Stephen G. Blumenreich, Shawn M. Cross, Brent B. Milner, David Rappaport, Christopher K. Schaefer, David M. Stubbs

Michael P. Lynn
Elizabeth Y. Ryan
Lynn Tillotson Pinker & Cox LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Attorney for Center for Strategic and International Studies, Inc.

The following defendants in Case No. 3:09-cv-724 are believed to be unserved or *pro se*:

Paul Adkins
Jeannette Aguilar
Peggy Allen
Juan Araujo
Monica Ardesi
Mauricio Aviles
Timothy Bambauer
Isaac Bar

Elias Barbar
Robert Barrett
Marie Bautista
Oswaldo Bencomo
Oscar Benedetti
Benito de Luca Trust
Bernadette C. Bergeron
Billy J. Bergeron
Marc H. Bettinger
Ramon Alvarez Borondo
Fabio Bramanti
Fernando Braojos
Richard Bucher
Fausto Callava
Robert Bryan Cannon
Rafael Carriles
Leopoldo Arosmena Cevasco
Naveen Chaudhary
Jane Chernovetzky
Compania Minera Caopas SA de CV
Bernard Cools-Lartigue
Don Cooper
Jose Cordero
Oscar Correa
James Cox
Ken Cimmins
James Cross
Mayra C. Leon DeCarrero
Andres Delgado
Pedro Delgado
Ana Dongilio
Sean Duffy
Christopher Shannon Elliotte
Neil Emery
Ayse Oya Erhan
Marina Feldman
Ignacio Felise
Freddy Fiorillo
Rosalia Fontanals
John Fry

Due Torben Garde
Genova Trust
Mark Gensch
Eric Gildhorn
Susan Glynn
Ramiro Gomez-Rincon
Angelo Victor Goncalves
Joaquin Gonzales
Juan Carlos Gonzales
Johnnie A. Griffith
Vivian Guarch
John Gutfranski
Jon Hanna
Charles Hazlett
Roberto T. Helguera
Martine Hernandez
Alfredo Herraez
Marcos Iturriza
Isabel Esther Benedetti de Izquiedo
Ines de Villamar
Shenoor Jadavji
Jennifer Savoie Johnson
Marty Karvelis
Faran Kassam
Michael Kepesky
Robert Klug
Roberto Gallardo Kuri
Humberto Lepage
Francois Lessard
James C. Li
Luis Felipe Lozano
David R. Lundquist
Lupe Martinez Trust
Paula Marlin
Iris Marcovich
Francesca McCann
Alberto Montero
Alnoor Nathoo
Gail Nelson
Russ Newton

Norfe S.A.
Walter Orejuela
Alfonso Ortega
Louise D. Patterson
Beatriz Pena
Ernesto Pena
Roberto Pena
Brandon R. Phillips
Eduardo Picon
Arturo Prum
Pubibubi Trust
Maria Putz
R. Edward Roybal MDPA Profit Sharing Plan
Radium Company Ltd.
Walter Ricardo
Roland Sam Torn
Franz Konrad Rosen
Salamon Dondich Rosenhaus
T. and R. Edward Roybal
Julio Ruelas
Peter R. Ross
Tatiana Saldivia
Saxonia Foundation
Schwob Construction Corp.
Aline C. Schwob
Morris Serrero
Nick Sherrod
Jordan F. Sibler
Rochelle Sidney
Edward Simmons
Peter Siragna
Sleeping Dog Holdings, Ltd.
Sociedad General dr Inversiones
Nancy Soto
Mark V. Stys
Ana Tanur
Tebel Corporation
Juan Carlos Terrazas
Yliana Torrealba
Jorge Emilio Garza Trevino

Nicolas Valera
Jamie Vargas
Mario Vieira
Evely Villalon
Chris Villemarette
Jose Alberto Romero Viloria
Daniel Vitrian
Ihab Yassine
Bernard E. Young
Charles Weiser
Robert C. Williams
Leon Zaidner

s/ Bradley W. Foster
**ATTORNEY FOR THE ALGUIRE APPELLANTS**

## STATEMENT OF COUNSEL PURSUANT TO FIFTH CIRCUIT RULE 35.2.2

Pursuant to Fed. R. App. 35(b)(1) and Fifth Circuit Rule 35.2.2, Appellants' counsel states as follows:

1. The panel applied the wrong standard of review to the district court's alter ego finding, in conflict with multiple prior decisions of this Court. *See Jab Energy Sols. II, L.L.C. v. Servicio Marina Superior, L.L.C.*, 640 Fed. Appx. 373 (5th Cir. 2016); *cert. denied*, 137 S. Ct. 161 (2016); *US Health Group v. South*, 636 Fed. Appx. 194 (5th Cir. 2015); *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347 (5th Cir. 2003); *Zahra Spiritual Trust v. U.S.*, 910 F.2d 240, 242 (5th Cir. 1990). Consideration by the full court is necessary to secure and maintain uniformity of the court's decisions.

2. The panel decision conflicts with *Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014), and consideration by the full court is necessary to secure and maintain uniformity of the court's decisions. In *Brown*, this Court held that the Stanford International Bank ("SIB") should not be treated as a legitimate entity for choice of law purposes. In direct conflict with *Brown*, the panel held that the Stanford entities should be treated as "separate legal entities … [that] are distinct from one another."

3. The panel's refusal to enforce the Appellants' arbitration agreements stands in direct conflict with the Eleventh Circuit's decision in *Wiand v.*

*Schneiderman*, 778 F. 3d 917 (11th Cir. 2015), and also conflicts with decisions from the Sixth and Tenth Circuits. *See Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 627 (6th Cir. 2003); *Capitol Life Ins. Co. v. Gallagher*, No. 94-1040, 1995 WL 66602 (10th Cir. Feb. 7, 1995). To permit a federal receiver to avoid the receivership entities' arbitration agreements would be unprecedented, and conflicts with the strong public policy in favor of arbitration articulated by the U.S. Supreme Court. These issues are of exceptional importance, and they warrant *en banc* review.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......... v

STATEMENT OF COUNSEL PURSUANT TO RULE 35.2.2 .......... xxiv

TABLE OF CONTENTS .......... xxvi

TABLE OF AUTHORITIES .......... xxvii

ISSUES MERITING *EN BANC* CONSIDERATION .......... 1

COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE .......... 1

STATEMENT OF RELEVANT FACTS .......... 4

ARGUMENT AND AUTHORITIES .......... 6

I. THE PANEL APPLIED THE WRONG STANDARD OF REVIEW, IN CONFLICT WITH MULTIPLE PRIOR DECISIONS OF THIS COURT. .......... 6

II. THE PANEL ERRONEOUSLY REJECTED THE DISTRICT COURT'S ALTER EGO FINDING, IN CONFLICT WITH THE RECEIVER'S PRIOR ADMISSIONS AND THIS COURT'S DECISION IN *JANVEY V. BROWN* .......... 8

III. THE PANEL OPINION CONFLICTS WITH THE *WIAND* DECISION FROM THE ELEVENTH CIRCUIT AND ADDITIONAL RECEIVERSHIP DECISIONS FROM THE SIXTH AND TENTH CIRCUITS .......... 11

IV. THE RECEIVER'S ARGUMENT THAT HE IS NOT BOUND BY STANFORD'S ARBITRATION AGREEMENTS IS CONTRARY TO *ALGUIRE III* AND MULTIPLE SUPREME COURT DECISIONS. .......... 14

CONCLUSION .......... 16

CERTIFICATE OF SERVICE .......... 20

CERTIFICATE OF COMPLIANCE .......... 23

**TABLE OF AUTHORITIES**

*Ahrens v. Perot Systems Corp.*,
205 F. 3d 831 (5th Cir. 2000) ....................................................................8

*Arthur Andersen LLP v. Carlisle,* 129 S. Ct. 1896 (2009) .......................................9

*Bridas S.A.P.I.C. v. Gov't of Turkm.*,
345 F.3d 347 (5th Cir. 2003) ......................................................................7

*Buckeye Check Cashing, Inc. v. Cardegna,*
546 U.S. 440 (2006)..................................................................................15

*Capitol Life Ins. Co. v. Gallagher,*
No. 94-1040, 1995 WL 66602 (10th Cir. Feb. 7, 1995)....................................13

*Dean Witter Reynolds v. Byrd,*
470 U.S. 213 (1985)..................................................................................16

*Eberhard v. Marcu,*
530 F.3d 122 (2d Cir. 2008) ......................................................................12

*Fleming v. Lind-Waldock & Co.,*
922 F.2d 20 (1st Cir. 1990).........................................................................12

*In re Merrill Lynch Trust Co. FSB,* 235 S.W.3d 185 (Tex. 2007) .........................10

*Jab Energy Sols. II, LLC v. Servicio Marina Superior, LLC,* 640 Fed.
Appx. 373 (5th Cir. 2016)*, cert. denied,* 137 S. Ct. 161 (2016)..........................6

*Janvey v. Alguire,*
2013 WL 2451738 (N.D. Tex. 2013) ..................................................................9

*Janvey v. Alguire,* 539 Fed. Appx. 478 (5th Cir. 2013)*, cert. denied,*
134 S. Ct. 2871 (2014) ("Alguire III") ................................................2, 3, 14, 16

*Janvey v. Alguire,*
2017 WL 430078 (5th Cir. Jan. 31, 2017)("*Alguire IV*")...........................*passim*

*Janvey v. v. Brown,*
767 F.3d 430 (5th Cir. 2014) ........................................................... 6, 8-10, 16

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
712 F.3d 185 (5th Cir. 2013) ....................................................................14

*Javitch v. First Union Securities Inc.*,
315 F.3d 619 (6th Cir. 2003) ................................................................2, 13

*Matter of Coston*, 991 F.2d 257 (*en banc*)(5th Cir. 1993).......................................7

*Preston v. Ferrer*,
552 U.S. 346 (2008)...................................................................................15

*Prima Paint Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
388 U.S. 395 (1967)................................................................................... 15

*RSR Corp. v. Int'l Ins. Co.*,
612 F.3d 851 (5th Cir. 2010) ......................................................................8

*Scholes v. Lehmann*,
56 F.3d 750 (7th Cir. 1995) ................................................................ 12, 13

*Shearson/American Express Inc. v. McMahon*,
482 U. S. 220 (1987)...................................................................................16

*Southland Corp. v. Keating*,
465 U.S. 1 (1984).......................................................................................16

*U.S. v. Herrera*, 313 F.3d 882 (*en banc*)(5th Cir. 2002) .........................................7

*U.S. v. Jon-T Chemicals, Inc.*, 768 F.2d 686 (5th Cir. 1985) ...................................8

*U.S. Health Group v. South*, 636 Fed. Appx. 194 (5th Cir. 2015) ............................6

*Wiand v. Schneiderman*, 778 F. 3d 917 (11th Cir. 2015)...........................11, 13, 15

*Wuliger v. Mfrs Life Ins. Co.*,
567 F.3d 787 (6th Cir. 2009) ...................................................................... 12

*Zahra Spiritual Trust v. U.S.*, 910 F.2d 240 (5th Cir. 1990) ....................................7

## ISSUES MERITING *EN BANC* CONSIDERATION

1. Did the panel err by applying the wrong standard of review to the district court's alter ego finding, in conflict with multiple decisions of this court?

2. Did the panel err in rejecting the district court's alter ego finding, in conflict with the court's decision in *Janvey v. Brown*?

3. Did the panel err in refusing to enforce Stanford's arbitration agreements, in conflict with decisions of the Sixth, Tenth, and Eleventh Circuits?

4. Is the Receiver's argument that he is not bound by Stanford's arbitration agreements contrary to this Court's decision in *Alguire III* and multiple decisions of the U.S. Supreme Court?

## COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

The panel's January 31, 2017 opinion is the *fourth* decision of this Court addressing the Appellants' motions to compel arbitration. The Court's decisions in *Alguire I–IV* have spanned six years, included two prior petitions for rehearing *en banc* (one apiece by the Receiver and the Appellees), and involved seven different judges. The case is ripe for *en banc* review.

This dispute arises from the Stanford Ponzi scheme. Appellee Ralph Janvey is the court-appointed Receiver for the Stanford entities, including Stanford Group Company ("SGC") and the Stanford International Bank ("SIB"). In the underlying

lawsuits, the Receiver has sued hundreds of former SGC employees seeking to "claw back" their employment compensation.

SGC is a registered broker-dealer and a member of the Financial Industry Regulatory Authority ("FINRA"), and the Appellants are FINRA-licensed stockbrokers. In response to the Receiver's lawsuits, Appellants filed motions to compel arbitration pursuant to FINRA rules, their FINRA U-4 Forms, and the terms of their written agreements with SGC.

Appellants have consistently argued throughout this seven-year dispute that the Receiver stands in the shoes of the Stanford entities, and therefore must honor SGC's arbitration agreements. The law is clear: a receiver "is bound to the arbitration agreements to the same extent that the receivership entities would have been absent the appointment of the receiver." *See Javitch v. First Union Securities Inc.*, 315 F.3d 619, 627 (6th Cir. 2003).

In two prior appeals to this Court (Nos. 10-10617 and 11-10838), the Receiver relied on a single argument in an attempt to avoid arbitration – that he is suing on behalf of third-party creditors rather than the Stanford entities, and therefore is not a party to Stanford's arbitration agreements. In *Alguire III*, this Court emphatically rejected the Receiver's standing argument: "We reverse the district court's denial of the motions to compel because a federal equity receiver

may not pursue claims on behalf of creditors." *Janvey v. Alguire*, 539 Fed. Appx. 478, 479 (5th Cir. 2013) ("*Alguire III*"), *cert. denied*, 134 S. Ct. 2871 (2014).

On remand, the sole question before the district court was whether the Receiver "*is bound by the arbitration clauses if he sues, as he must, on behalf of the Stanford Entities*." *Alguire III*, 539 Fed. Appx. at 480. In addressing this question, the district court ruled *in favor of the Appellants*, determining that: (1) "the Receiver's claims in this case are derived solely from the Stanford Entities;" (2) the Stanford entities operated as a single entity; (3) the Receiver's claims are encompassed by the defendants' arbitration agreements; and (4) the arbitration agreements are valid under state law. ROA.14-10857.16178, 16180, 16183.

Based on these findings, the district court should have compelled arbitration. Nevertheless, it denied Appellants' motions on two new grounds. First, the district court held that the Receiver has the power to "reject" the Stanford Entities' arbitration agreements as "executory" contracts. ROA.14-10857.16185-94. Second, the district court held that federal receivership law conflicts with and therefore "overrides" the Federal Arbitration Act. ROA.14-10857.16195-16209. Both holdings are contrary to the overwhelming weight of federal authority. On July 31, 2014, the Alguire Appellants filed their *third* Notice of Appeal. ROA.14-10857.16219-21.

On January 31, 2017, the panel decision affirmed the district court's order, *despite rejecting Judge Godbey's factual findings and legal conclusions across the board.* The panel declined to override the Federal Arbitration Act, stating that it was "wary of endorsing" the district court's "broad policy arguments." *See Janvey v. Alguire*, 2017 WL 430078 (5th Cir. Jan. 31, 2017)("*Alguire IV*"), at *7. Instead, the panel affirmed the decision of the district court through the back door, by *reversing* its alter ego determination. This was error.

The panel decision: (1) applied an incorrect standard of review, in conflict with multiple decisions of this Court; (2) conflicts with this Court's prior opinion in *Janvey v. Brown* (Case No. 13-10266); and (3) additionally conflicts with decisions from the Sixth, Tenth, and Eleventh Circuits.

## STATEMENT OF RELEVANT FACTS

The Receiver has sued hundreds of former SGC employees, seeking to "claw back" their employment compensation. ROA.14-10857.1794-1819.

SGC is a registered broker-dealer and a member of the Financial Industry Regulatory Authority ("FINRA"), the combined regulatory arm of the New York Stock Exchange and the National Association of Securities Dealers. ROA.14-10857.2099-2135.

The Appellants were FINRA-licensed stockbrokers employed by SGC. Appellants have filed motions to compel arbitration of the Receiver's claims

pursuant to FINRA rules, their FINRA U-4 Forms, and the terms of their written agreements with SGC. ROA.14-10857.2032-2056, 2057-2490, 2491-2501, 3685-3693, 4082-4090.

It is undisputed that the Receiver's claims are encompassed by the Appellants' arbitration agreements, and that the arbitration agreements are valid under state law. ROA.14-10857.16178.

The district court determined that "the Receiver's claims in this case are derived solely from the Stanford Entities." ROA.14-10857.16183. The district court further determined that the Stanford entities operated "*as a single entity*." ROA.14-10857.16179 (emphasis added). The district court rejected the argument that the Receiver "may pick and choose on which receivership entity's behalf" he brings his various clams on the grounds as "*inconsistent with the Court's previous rulings and inconsistent with equity*." ROA.14-10857.16178-79 (emphasis added).

Throughout the Stanford litigation, the Receiver has argued that SIB and SGC were alter egos. *See, e.g.*, ROA.14-10857.19226 ("The Court should not treat SIB as a separate corporate entity."); ROA.14-10857.19183 ("The facts of the Stanford Ponzi scheme are such that multiple alter ego grounds ... support disregarding SIB's supposed corporate separateness."); ROA.14-10857.19222 ("SIB was a sham corporation whose separateness was ignored by Stanford and his co-conspirators."). Based on these arguments, the district court has issued multiple

prior orders holding that the Stanford entities operated as a single business enterprise. ROA.14-10857.16179, 19323, 19333, 19427.

The Receiver has similarly argued to this Court that SIB was a "sham" corporation controlled from Texas. *See* Receiver's Brief, Case No. 13-10266, at 9, 38. This Court relied upon such representations in *Janvey v. Brown*, 767 F.3d 430, 435-36 (5th Cir. 2014) (applying a "false conflict" analysis, court held that SIB should not be treated as legitimate entity for choice of law purposes).

## ARGUMENT AND AUTHORITIES

### I. THE PANEL APPLIED THE WRONG STANDARD OF REVIEW, IN CONFLICT WITH MULTIPLE PRIOR DECISIONS OF THIS COURT

The district court ruled that the Stanford entities constitute a single business enterprise. ROA.14-10857.16178-79. The panel opinion rejected the district court's determination, but did so without specifically addressing the district court's conclusions and without regard to the requisite standard of review.

Alter ego determinations are reviewed for clear error. The panel failed to apply that standard, in conflict with multiple prior decisions of this Court. *See Jab Energy Sols. II, LLC v. Servicio Marina Superior, LLC*, 640 Fed. Appx. 373, 376 (5th Cir. 2016)("We review alter ego determinations for clear error."), *cert. denied*, 137 S. Ct. 161 (2016); *U.S. Health Group v. South*, 636 Fed. Appx. 194, 198 (5th Cir. 2015) ("Whether an alter ego relationship existed is a question of fact that we

review for clear error."); *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 359 (5th Cir. 2003) ("Alter ego determinations are reviewed in this circuit only for clear error."); *Zahra Spiritual Trust v. U.S.*, 910 F.2d 240, 242 (5th Cir. 1990) ("Our court has previously held that a district court's finding of an alter ego relationship is reviewed for clear error."). *See also* Reply Brief of the Alguire Appellants, at 3-4.

The panel's only statement of the standard of review was as follows: "We review the denial of a motion to compel arbitration *de novo*, but we review the district court's factual findings for clear error." *Alguire IV*, 2017 WL 430078, at *3. The panel did not address the standard of review for alter ego determinations, and it did not purport to apply the requisite clearly erroneous standard to the district court's alter ego determination. To the contrary, the panel conducted a *de novo* review of the alter ego issue, substituting its own judgment for the district court's findings and conclusions. *See Alguire IV*, 2017 WL 430078, at *5.

The panel's decision creates an intra-circuit conflict, and *en banc* review is appropriate. *See, e.g., Matter of Coston*, 991 F.2d 257, 259 (*en banc*) (5th Cir. 1993) ("We have taken this case *en banc* for the sole purpose of deciding whether the 'reasonableness' of a creditor's reliance under 11 U.S.C. § 523(a)(2)(B) is an issue of law subject to de novo review on appeal or a question of fact to be reviewed under the clearly erroneous standard."); *U.S. v. Herrera*, 313 F.3d 882,

883 (*en banc*) (5th Cir. 2002) ("Primarily at issue is the correct standard of review …").

## II. THE PANEL ERRONEOUSLY REJECTED THE DISTRICT COURT'S ALTER EGO FINDING, IN CONFLICT WITH THE RECEIVER'S PRIOR ADMISSIONS AND THIS COURT'S DECISION IN *JANVEY V. BROWN*

The district court ruled that the Stanford entities constitute a single business enterprise, and therefore the Receiver is bound by SGC's arbitration agreements.[1] ROA.14-10857.16180. In light of the *Receiver's own arguments* in favor of an alter ego determination, the district court had ample discretion to make this ruling.[2] As this Court has recognized, [r]esolution of the alter ego issue is heavily fact-specific and, as such, is peculiarly within the province of the trial court." *U.S. v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 694 (5th Cir. 1985).

The *Receiver himself* has repeatedly argued that SGC and SIB were alter egos of a single business enterprise:

---

[1] If a non-signatory to an arbitration agreement is the alter ego of a signatory, the non-signatory is bound to the arbitration agreement. *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 359 (5th Cir. 2003); *see also Arthur Andersen LLP v. Carlisle*, 129 S. Ct. 1896, 1902 (2009) (arbitration agreements may be enforced under alter ego theory).

[2] Indeed, the district court's decision on this point was emphatically correct. The Receiver sought and obtained an alter ego ruling from the district court, and he is judicially estopped from making a contrary argument now. *See RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 859 (5th Cir. 2010) ("The doctrine of judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding."); *Ahrens v. Perot Systems Corp.*, 205 F. 3d 831 (5th Cir. 2000).

- "The Court should not treat SIB as a separate corporate entity." ROA.14-10857.19226.
- "SIB was a sham corporation whose separateness was ignored by Stanford and his co-conspirators." ROA.14-10857.19222.
- "The facts of the Stanford Ponzi scheme are such that multiple alter ego grounds … support disregarding SIB's supposed corporate separateness." ROA.14-10857.19183.
- "Ponzi schemes fit precisely the alter ego and 'sham to perpetrate a fraud' grounds for disregarding the corporate fiction." ROA.14-10857.19196.

In reliance on the Receiver's alter ego arguments, the district court has issued multiple orders holding that the Stanford entities operated as a single business enterprise, including a prior order in *Janvey v. Alguire*, which was affirmed by this Court in *Janvey v Brown*. *See Janvey v. Alguire*, 2013 WL 2451738, at *2 (N.D. Tex. 2013) ("The Court … treats the Stanford Entities as a single entity."), *aff'd sub nom.*, *Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014).

The panel decision conflicts with this Court's prior opinion in *Janvey v. Brown*. In *Brown*, the Receiver *represented to this Court* that SIB was a "sham" corporation controlled from Texas. *See* Receiver's Brief, Case No. 13-10266, at 9, 38. Accordingly, this Court held that SIB should not be treated as legitimate entity

for choice of law purposes. *Janvey v. Brown*, 767 F.3d at 434-36. Applying a "false-conflict" analysis, the Court held that "although there were numerous Stanford entities, these entities were mere conduits by which Stanford and Davis carried out the Ponzi scheme." *Id*. at 436. *Brown* arose from the same underlying lawsuit as this action – the Receiver is asserting claims against both investors and employees in *Janvey v. Alguire*. And yet in stark contrast to *Brown*, the *Alguire IV* panel held that the Stanford entities should be treated as "separate legal entities … [that] are distinct from one another." *Alguire, IV*, 2017 WL 430078, at *4.[3]

This conflict warrants rehearing *en banc*. It is nonsensical, and grossly unfair, to permit the Receiver to make inconsistent alter ego arguments in the same case, piercing the corporate veil to avoid choice of law concerns, but hiding behind "sham" corporate walls to avoid honoring his contracts. As the district court held, "allowing the Receiver to pick and choose, as a litigation strategy, among separate Stanford corporations in deciding upon which Stanford entity the Receiver brings his various claims would be inconsistent with the Court's previous rulings and inconsistent with equity." ROA.14-10857.16179.

[3] The panel also declined to enforce the arbitration provisions in SGC's promissory notes, which "inure to the benefit of the Company [SGC] and its affiliates …" *Alguire IV*, 2017 WL 430078, at *5. The panel held that "references to 'affiliates' in the arbitration agreements are insufficient to bind [SIB]." *Id.* (citing *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007)). The *Merrill Lynch* case, however, also states: "Of course, if two corporations are actually operated as one, many courts recognize an alter-ego exception that will bind one to the arbitration agreements of the other." *In re Merrill Lynch*, 235 S.W.3d at 191.

## III. THE PANEL OPINION CONFLICTS WITH THE *WIAND* DECISION FROM THE ELEVENTH CIRCUIT AND ADDITIONAL RECEIVERSHIP DECISIONS FROM THE SIXTH AND TENTH CIRCUITS

The panel decision conflicts with the Eleventh Circuit's decision in *Wiand v. Schneiderman*, 778 F. 3d 917 (11th Cir. 2015), which agreed with the district court that an SEC receiver may not "pick and choose" which entity should pursue fraudulent transfer claims on behalf of the receivership. *See Wiand*, 778 F.3d at 925. *Wiand* is the single most analogous case to the present appeal, addressing in considerable detail – and rejecting – the same policy arguments advanced by the Receiver to override the Federal Arbitration Act:

> Wiand argues that there is an inherent conflict between arbitration and the underlying purpose of 28 U.S.C. § 754. …
>
> But Wiand's argument is fundamentally flawed because he mischaracterizes the statute on which he relies. Section 754 does not designate district courts as having complete jurisdiction and control of receivership properties as Wiand claims. …
>
> [O]ther courts that have dealt with receivers in securities litigation have referred the disputes to arbitration. In light of this precedent [and] the ''liberal federal policy'' in favor of arbitration, … we find that there is no inherent conflict between arbitration and the underlying purpose of court-appointed receivers pursuing clawback claims.

*Id.*, 778 F. 3d at 922-24 (citations omitted).

The panel opinion relegated *Wiand* to a single footnote, dismissing the Eleventh Circuit's decision as "distinguishable" because TUFTA permits creditors

to pursue claims against "subsequent transferees." *Alguire IV*, 2017 WL 430078, at *5 & n.9. But so does the analogous Florida statute – it is, after all, a "uniform" statute. *See* Fla. Stats. §726.109(2)(b) (under FUFTA, creditor may recover from "subsequent transferee"). The point is that the Receiver, as the successor to SGC, cannot engage in a sleight-of-hand to avoid SGC's arbitration agreements. The district court did not permit this, and neither did the Eleventh Circuit.

*Scholes* does not support a contrary result. In *Scholes*, the Seventh Circuit crafted a limited exception to the *in pari delicto* doctrine, so that equity receivers would have standing to pursue fraudulent transfer claims. *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995). *Scholes* does *not* permit a receiver to otherwise disregard the obligations of the receivership entities. "[T]he authority of a receiver is defined by the entity or entities in the receivership." *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d. Cir. 2008); *see also Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 25 (1st Cir. 1990) (receiver "can only make a claim which the corporation could have made"); *Wuliger v. Mfrs Life Ins. Co.*, 567 F.3d 787, 798- 99 (6th Cir. 2009) (receiver is "subject to the same claims and defenses as the received entity he represents").

The Receiver has expressly recognized the limited applicability of *Scholes*. In his petition for certiorari after *Alguire III*, the Receiver stated: "*Scholes* and its progeny ... provide a creative path for receivers to assert some claims … even

when the receiver is denied standing to assert claims on behalf of all creditors generally. But they do so with serious costs. … [E]ven if receivers could avoid the defense of *in pari delicto*, the receiver presumably **would still have to litigate against any other defenses** that recipients of fraudulent transfers might have against the entities but that they would not have against the creditors.” ROA.14-10857.15643 (emphasis added).

*Scholes* is not a talisman – the Receiver *still has to litigate other defenses*, including defenses based on Stanford’s arbitration agreements. To permit a federal receiver to avoid the receivership entities’ arbitration agreements – whether based on “public policy” or “equity” or any other grounds -- would be unprecedented, and it would directly conflict with decisions from the Sixth, Tenth, and Eleventh Circuits. *See Javitch*, 315 F.3d at 627 (receiver “is bound to the arbitration agreements to the same extent that the receivership entities would have been absent the appointment of the receiver”); *Capitol Life Ins. Co. v. Gallagher*, No. 94-1040, 1995 WL 66602, at *2 (10th Cir. Feb. 7, 1995) ("[the receiver] may be compelled to arbitrate because a receiver 'stands in the shoes' of the [receivership entity]"); *Wiand*, 778 F.3d at 922-24 (requiring arbitration of Ponzi-scheme receiver’s fraudulent transfer claims).

## IV. THE RECEIVER'S ARGUMENT THAT HE IS NOT BOUND BY STANFORD'S ARBITRATION AGREEMENTS IS CONTRARY TO *ALGUIRE III* AND MULTIPLE SUPREME COURT DECISIONS

Finally, the panel erroneously states that the Receiver "makes a strong argument" that the Appellants' arbitration agreements are unenforceable because they were "instruments of the fraud." *Alguire IV*, 2017 WL 430078, at *7. This is emphatically not the law.

On remand, the Receiver re-urged the same arguments he *lost* in *Alguire III*:

> The FA Defendants insist that "a receiver is bound to [the receivership entities'] arbitration agreements to the same extent that the receivership entities would have been absent the appointment of a receiver." The FA Defendants are wrong …
>
> It would be incongruous and illogical to allow the Receiver to recover fraudulent transfers on behalf of SGC on the grounds that those transfers were actually made by the Ponzi scheme principals, but at the same time subject the Receiver to the arbitration agreements and obligations that the principals incurred on behalf of SGC in connection with those transfers.

ROA.14-10857.15594-95. As the district court recognized, such arguments are directly contrary to this Court's holdings in *DSCC II* and *Alguire III*. ROA.14-10857.16183.

This Court has explicitly held that the Receiver "has standing to assert *only the claims of the entities in receivership*." *DSCC II*, 712 F.3d at 190 (emphasis added). He "*must*" sue on behalf of the Stanford Entities. *Alguire III*, 539 Fed. Appx. at 480 (emphasis added). That was the whole point of this Court's decision

in *Alguire III*. And because he stands in the shoes of the Stanford entities, the Receiver is subject to all agreements and obligations of those entities – including arbitration.

The Receiver may claim that Stanford's arbitration agreements were "instruments of fraud," but that has no bearing on the validity of the Appellants' arbitration agreements. The Supreme Court has repeatedly emphasized that "a challenge to the validity of a contract as a whole, and not specifically to the arbitration clause within it, must go to the arbitrator, not the court." *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 449 (2006); *see also Preston v. Ferrer*, 552 U.S. 346, 353 (2008) ("attacks on an entire contract's validity, as distinct from attacks on the arbitration clause alone, are within the arbitrator's ken"); *Prima Paint Prima Paint Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395, 402 (1967) ("arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded").

In *Wiand*, as in this case, a federal receiver argued that a Ponzi-schemer's arbitration agreements were invalid and should not be enforced. The Eleventh Circuit rejected that argument, citing clear Supreme Court precedent. *Wiand*, 778 F.3d at 924. This Court should do the same.

## CONCLUSION

The Supreme Court has repeatedly emphasized that the Federal Arbitration Act ("FAA") embodies a strong public policy in favor of arbitration, *see*, *e.g.*, *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984) (citing "national policy favoring arbitration"), and it requires courts to "rigorously enforce arbitration agreements." *Shearson/American Express Inc. v. McMahon*, 482 U. S. 220, 226 (1987) (quoting *Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 221 (1985)).

In *Alguire III*, this Court concluded that the Receiver "must" sue "on behalf of the Stanford entities." *See Alguire III*, 539 Fed. Appx. at 480. The district court erred by permitting the Receiver to avoid arbitration on grounds that are *not* available to the Stanford entities. The panel in *Alguire IV* compounded that error by disregarding the district court's factual findings on alter ego, in conflict with the Receiver's own admissions and this Court's prior decision in *Janvey v. Brown*.

Despite seven years of litigation, this is – or at least should be – a simple case. The law is clear: a federal receiver stands in the shoes of the receivership entities, and he is bound to those entities' arbitration agreements. This is a universal rule, and no federal court has ever held to the contrary. Appellants respectfully ask the court to reconsider the panel decision *en banc*.

Respectfully submitted,

s/ Bradley W. Foster
Bradley W. Foster
Texas State Bar No. 07283200
bradfoster@andrewskurth.com
Matthew G. Nielsen
Texas State Bar No. 24032792
matthewnielsen@andrewskurth.com
Andrews Kurth LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone: (214) 659-4400
Facsimile: (214) 659-4401

**ATTORNEYS FOR THE ALGUIRE APPELLANTS (115 FA DEFENDANTS)**

s/ Jason W. Graham
Jason Wayne Graham
jgraham@grahamjensen.com
Theodore Brandon Welch
bwelch@grahamjensen.com
Graham & Jensen, L.L.P.
17 Executive Park Drive, Suite 115
(404) 842-9380 (Telephone)
(678) 904-3110 (Facsimile)

**ATTORNEYS FOR APPELLANTS STEVE SLEWITZKE, ET AL.**

s/ Michael John Stanley
Michael John Stanley
mstanley@stanleylaw.com
Stanley, Frank & Rose, L.L.P.
7026 Old Katy Road

Houston, Texas 77024
(713) 980-4381 (Telephone)
(713) 980-1179 (Facsimile)

**ATTORNEY FOR APPELLANTS SUSANA ANGUIANO ET AL.; JUAN A. RINCON; AND LUIS GIUSTI**

s/ Mark Joseph Barrera
Monroe David Bryant, Jr.
Dykema Cox Smith
1201 Elm Street, Suite 3300
Renaissance Tower
Dallas, Texas 75270
(214) 698-7800 (Telephone)
(214) 698-7899 (Facsimile)

Mark Joseph Barrera
Dykema Cox Smith
112 E. Pecan Street, Suite 1800
Weston Centre
San Antonio, Texas 78205
(210) 554-5314 (Telephone)
(210) 226-8395 (Facsimile)

**ATTORNEYS FOR APPELLANT ORESTE TONARELLI**

s/ Walter Perry Zivley, Jr.
Walter Perry Zivley, Jr.
pzivley@cmzlaw.net
Chandler, Mathis & Zivley, P.C.
601 Sawyer, Suite 600
Houston, Texas 77007
(713) 739-7722 (Telephone)
(713) 739-0922 (Facsimile)

**ATTORNEYS FOR APPELLANTS DAVID WAYNE KRUMREY, ET AL.**

s/ Carolyn R. Raines
Carolyn R. Raines
CRaines@GodwinLaw.com
Godwin Bowman & Martinez PC
1201 Elm Street, Suite 1700
Renaissance Tower
Dallas, Texas 75270
(214) 939-4452 (Telephone)
(214) 527-3137 (Facsimile)

**ATTORNEYS FOR APPELLANT JOHN D. ORCUTT**

s/ Michael L. O'Brien
Michael L. O'Brien
mike@moblaw.com
Mike O'Brien P.C.
14355 Highway 105
Washington, Texas 77880
(713) 222-0088 (Telephone)
(713) 222-0888 (Facsimile)

**ATTORNEYS FOR APPELLANT CHARLES RAWL**

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2017, **APPELLANTS' PETITION FOR REHEARING *EN BANC*** was filed using the United Stated Court of Appeals for the Fifth Circuit's ECF/CM system and the below listed counsel were served via the court's electronic Notice of Docket Activity or electronic mail pursuant to 5th Cir. R. 25.2.5:

Kevin Sadler — kevin.sadler@bakerbotts.com
David T Arlington — david.arlington@bakerbotts.com
Scott D. Powers — scott.powers@bakerbotts.com
Stephanie Frederique Cagniart — cagniart@bakerbotts.com
Baker Botts LLP
98 San Jacinto Blvd., Suite 1500
Austin, TX 78701-4078

Timothy S. Durst — tim.durst@bakerbotts.com
2001 Ross Ave.
Dallas, TX 75201

**Attorneys for Ralph S. Janvey, Plaintiff-Appellant**

Edward C. Snyder — esnyder@casnlaw.com
Castillo Snyder, P.C.
300 Convent Street, Suite 1020
Bank of America Plaza
San Antonio, TX 78205-0000

**Attorney for Official Stanford Investors Committee**

Michael L. O'Brien — mike@moblaw.com
Mike O'Brien P.C.
14355 Highway 105, Suite1000
Washington, TX 77880

**Attorneys for Charles Rawl**

Kim Bernard Battaglini kbattaglini@strongpipkin.com
Strong Pipkin Bissell &
Ledyard, L.L.P.
Suite 1200
4900 Woodway Drive
Houston, TX 77056

**Attorneys for Mark Tidwell**

Michael John Stanley mstanley@stanleylaw.com
Stanley, Frank & Rose, L.L.P.
7026 Old Katy Road
Houston, TX 77024

**Attorneys for Susana Anguiano, Teral Bennett, Lori Bensing, Susana Cisneros, Ron Clayton, et al.; Juan Alberto Rincon; and Luis Giusti**

John C. Porter, Jr., Esq. jporter@sbpllplaw.com
Brian N. Smiley bnsmiley@sbpllplaw.com
Smiley Bishop & Porter, L.L.P.
1050 Crown Pointe Parkway
Atlanta, GA 30338-0000

Robert Lee Wright rwright@rlwpc.com
Wright & Berry
612 8th Avenue
Fort Worth, TX 76104-0000

**Attorneys for Alan Brookshire, James C. Chandley, David Braxton Gray, Gregory C. Gibson, John Grear, Jason Likens, Kale Olsen, Timothy D. Rogers, John Whitfield Wilks**

Carolyn R. Raines, Esq. CRaines@GodwinLaw.com
Godwin Bowman & Martinez PC
1201 Elm Street, Suite 1700
Dallas, Texas 75270

**Attorney for John D. Orcutt**

Jason W. Graham jgraham@grahamjensen.com
T. Brandon Welch bwelch@grahamjensen.com
Graham & Jensen, L.L.P.
17 Executive Park Drive
Suite 115
Atlanta, GA 30329

Robert Lee Wright rwright@rlwpc.com
Wright & Berry
612 8th Avenue
Fort Worth, TX 76104-0000

**Attorneys for Steve Slewitzke, Brad Bradham, Nolan Farhy, Virgil Harris, Louis Schaufele, Eric Urena, Blanca Fernandez, Nancy J. Huggins**

Walter Perry Zivley, Jr. pzivley@cmzlaw.net
Chandler, Mathis & Zivley, P.C.
601 Sawyer, Suite 600
Houston, TX 77007

**Attorneys for David Wayne Krumrey and Randolph E. Robertson**

David Bryant, Jr. dbryant@dykema.com
Mark Joseph Barrera mbarrera@dykema.com
Dykema Cox Smith
1201 Elm Street, Suite 300
Renaissance Tower
Dallas, Texas 75270

**Attorney for Oreste Tonarelli**

s/ Bradley W. Foster

# CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type volume limitations of Fed. R. App. P. 35(b)(2)(A).

1. Excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.2, the brief contains 3,693 words.

2. The brief has been prepared in proportionally spaced typeface using:

Software Name and Version: Microsoft Word for Mac 2011,
Typeface Name: Times New Roman,
Font Size: 14 point.

s/ Bradley W. Foster
Bradley W. Foster

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

No. 14-10857

---

United States Court of Appeals
Fifth Circuit

**FILED**
January 31, 2017

Lyle W. Cayce
Clerk

RALPH S. JANVEY,

Plaintiff – Appellee,

v.

JAMES R. ALGUIRE; VICTORIA ANCTIL; TIFFANY ANGELLE; SYLVIA AQUINO; JONATHAN BARRACK; MARK TIDWELL; CHARLES RAWL; SUSANA ANGUIANO; TERAL BENNETT; LORI BENSING; SUSANA CISNEROS; RON CLAYTON, JOHN D. ORCUTT, et al.,

Defendants – Appellants.

---

CONSOLIDATED WITH 14-10945

RALPH S. JANVEY, in his capacity as Court-Appointed Receiver for the Stanford International Bank, Limited, et al.,

Plaintiff – Appellee,

v.

ORESTE TONARELLI,

Defendant – Appellant.

---

CONSOLIDATED WITH 14-11014

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

RALPH S. JANVEY, in his capacity as Court-Appointed Receiver for the Stanford International Bank, Limited, et al.,

Plaintiff – Appellee,

v.

JUAN ALBERTO RINCON,

Defendant – Appellant.

---

CONSOLIDATED WITH 14-11093

RALPH S. JANVEY, in his capacity as Court Appointed Receiver for the Stanford International Bank Limited, et al.; OFFICIAL STANFORD INVESTORS COMMITTEE,

Plaintiffs – Appellees,

v.

LUIS GIUSTI,

Defendant – Appellant.

---

Appeals from the United States District Court
for the Northern District of Texas

---

Before HIGGINBOTHAM, OWEN, and ELROD, Circuit Judges.

PER CURIAM:

This case is the latest in a number of appeals arising from the collapse of Allen Stanford's massive Ponzi scheme. Ralph Janvey, the Receiver for the

Stanford entities, seeks to use the Texas Uniform Fraudulent Transfer Act to take back money paid to employees of various Stanford entities. The district court denied these employees' motions to compel arbitration based on arbitration agreements included in the terms of contracts with the Stanford Group Company. We AFFIRM.

**I.**

R. Allen Stanford created a large network of interconnected companies that sold certificates of deposit to investors through the Stanford International Bank, Ltd. (the "Bank"). These certificates of deposit promised favorable returns and drew over $7 billion in investments in the nearly ten years that the scheme operated. Stanford generated the promised returns not by wisely managing the investors' money but by using payments from new investors to cover the gains paid to older investors—a classic Ponzi scheme. Stanford and his Chief Financial Officer, James Davis, pleaded guilty to a number of federal offenses and are currently incarcerated.

In an effort to unwind the scheme, the Securities and Exchange Commission sued Stanford, the Stanford Group Company (the "Company"), and numerous other Stanford entities. At the SEC's request, the district court appointed Janvey as Receiver and "charged him with preserving corporate resources and recovering corporate assets that had been transferred in fraudulent conveyances." *Janvey v. Brown*, 767 F.3d 430, 433 (5th Cir. 2014).

The Receiver sued a large group of individuals who profited from the Stanford scheme and froze assets in Stanford entity accounts tied to those individuals. The district court severed the Receiver's claims against investor-defendants from the Receiver's claims against employee-defendants. This

court has dealt separately with various claims against the investor-defendants and they are not at issue here.[1]

The defendants in the present action all previously worked in various capacities for the Stanford enterprises and received salary, commissions, bonuses, or later-forgiven loans from the Stanford entities.

Shortly after the Receiver initiated his claims against these former employees, they moved to compel arbitration. The motions to compel arbitration relied on arbitration agreements between the Company or Stanford Group Holdings, Inc. (another Stanford entity) and the former employees.[2] The agreements were contained in: (1) promissory notes between the defendants and the Company that governed the upfront loan payments that the Company awarded to the defendants when they joined Stanford; (2) the broker-dealer forms that the Company submitted to the Financial Industry Regulation Authority (FINRA) when registering the employee-defendants as brokers; (3) FINRA's internal rules governing disputes between brokers and their employers; and (4) Stanford Group Holdings, Inc.'s Performance Appreciation Rights plan. The arbitration clauses in the promissory notes provide that: "any controversy arising out of or relating to this Note, or default on this Note, shall be submitted to and settled by arbitration pursuant to the constitution, by-laws, rules and regulations of the National Association of

[1] A more exhaustive factual background can be found in other cases involving the Stanford Ponzi scheme. *See, e.g.*, *United States v. Stanford*, 805 F.3d 557, 563–65 (5th Cir. 2015), *cert denied*, 137 S. Ct. 491 (2016); *Brown*, 767 F.3d at 432–34; *Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 712 F.3d 185, 188–89 (5th Cir. 2013); *Janvey v. Alguire*, 647 F.3d 585, 589–91 (5th Cir. 2011); *Janvey v. Adams*, 588 F.3d 831, 833–35 (5th Cir. 2009).

[2] One of the employee-defendants, Luis Giusti, signed an arbitration agreement in which the Bank was the counterparty.

Securities Dealers (NASD) . . . ."[3] The other arbitration clauses are materially indistinguishable for purposes of this case.

While the motions to compel arbitration were pending, the district court issued a preliminary injunction preventing the employees from accessing the frozen assets. The defendants challenged the injunction in an interlocutory appeal. We held that: (1) the district court had power to consider the preliminary injunction before deciding the motion to compel arbitration; (2) the district court did not abuse its discretion by issuing the preliminary injunction; (3) the preliminary injunction was neither an attachment nor overly broad; and (4) although the district court had not yet ruled on the motion to compel arbitration, the Receiver's claims were not subject to the arbitration agreement because the Receiver was suing not on behalf of the Stanford entities, but rather on behalf of creditors who were not parties to the arbitration agreements. *Janvey v. Alguire* (*Alguire I*), 628 F.3d 164, 185 (5th Cir. 2010). We then withdrew that opinion and replaced it with another opinion that repeated the first three holdings but concluded that we lacked jurisdiction over the still-pending motion to compel arbitration and remanded to the district court for consideration of the motion in the first instance. *Janvey v. Alguire* (*Alguire II*), 647 F.3d 585, 605 (5th Cir. 2011).

The district court, although not bound by our decision in *Alguire I*, agreed with its reasoning and denied the motions to compel arbitration. As we had in *Alguire I*, the district court reasoned that the Receiver's claims, brought on behalf of third-party creditors, were not affected by the promissory notes between the defendants and the Company. *Janvey v. Alguire*, No. 3:09-cv-724, 2011 WL 10893950, at *4 (N.D. Tex. Aug. 26, 2011).

[3] Later arbitration agreements required arbitration governed by the rules of FINRA, the successor to NASD.

While the appeal from that decision was pending, we held in another Stanford scheme appeal that the Receiver represented the creditors, not the Stanford entities. *Janvey v. Democratic Senatorial Campaign Committee, Inc.* (*DSCC I*), 699 F.3d 848 (5th Cir. 2012). We withdrew that opinion and issued another, concluding instead that:

> [A] federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors, but the knowledge and effects of the fraud of the principal of a Ponzi scheme in making fraudulent conveyances of the funds of the corporations under his evil coercion are not imputed to his captive corporations. Thus, once freed of his coercion by the court's appointment of a receiver, the corporations in receivership, through the receiver, may recover assets or funds that the principal fraudulently diverted to third parties without receiving reasonably equivalent value.

*Janvey v. Democratic Senatorial Campaign Committee, Inc.* (*DSCC II*), 712 F.3d 185, 190 (5th Cir. 2013). This holding invalidated the basis for the district court's denial of the motions to compel arbitration. As a result, we vacated the denial of the motion to compel and remanded once again for the district court to reconsider the motions in light of *DSCC II*. *Janvey v. Alguire* (*Alguire III*), 539 F. App'x 478, 480–81 (5th Cir. 2013).

The district court once again denied the motions to compel, resting its result on three major conclusions. First, the district court rejected the Receiver's argument that he can choose the Stanford entity on whose behalf he sues, instead requiring the Receiver to sue on behalf of the Company, which was party to the arbitration agreements. *Janvey v. Alguire* (Denial Order), No. 3:09-cv-724, ECF No. 1093, at 9–10 (N.D. Tex. July 30, 2014) (order denying motions to compel arbitration).

Second, the district court concluded that the Receiver had rejected the arbitration agreements and that such rejection was permissible. *Id.* at 16–25.

The district court, drawing from well-established bankruptcy law, determined that an equity receiver, like a bankruptcy trustee, has the power to assume or reject any executory contract. The district court concluded that executory arbitration agreements are analyzed as separable from the contracts in which they are contained. Turning to the arbitration agreements in this case, the district court rejected the defendants' argument that the Receiver had not rejected the agreements, noting that federal equity receivers have no obligation to affirmatively reject an executory contract. The district court determined that the Receiver's rejection of the arbitration agreements was permissible, explaining that it would be "unjust and inequitable" to burden and deplete the receivership estate by requiring the Receiver to adopt the arbitration agreements.

Finally, the district court concluded in the alternative that arbitration of the Receiver's claims would conflict with the central purposes and objectives of the federal equity receivership statutory scheme, and therefore exercised its discretion to deny the motions to compel arbitration. *Id.* at 26–49. The district court noted that in the receivership statutes Congress had "clearly emphasized the importance of consolidating in one court all matters involving the receivership estate and assets," that courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, and that the federal multidistrict litigation scheme implicated in this receivership also emphasizes consolidation before one court. *Id.* at 33–36. Drawing from case law involving conflicts between the purposes of the Bankruptcy Code and the Federal Arbitration Act (FAA), the district court concluded that

> a specific conflict arises between arbitrating the Receiver's fraudulent transfer claims under the Employee Defendants' arbitration agreements and certain central purposes of the federal

> equity receivership statutory framework, especially in the added context of the Stanford receivership being a multidistrict litigation SEC receivership over a Ponzi scheme.

*Id*. at 41. Considering that "[a]rbitration decentralizes, deconsolidates, strips the court and the receiver of exclusive jurisdiction over the receivership assets, interferes with the broad powers of both the court and the receiver to adjudicate all issues affecting receivership assets," *id*. at 46, and interferes with equal distribution of assets, the district court exercised its discretion to deny the motions to compel arbitration. *Id*. at 47–49.

In separate orders, the district court denied motions to compel arbitration filed by Juan Rincon (the former Executive Vice President and Chief Financial Officer of the Company),[4] Luis Giusti (a former member of the Bank's advisory board),[5] and Oreste Tonarelli (a former managing director of the Company's Private Clients Group).[6] The defendants appeal and their appeals were consolidated.

## II.

We have jurisdiction to consider this appeal even though the district court's denials of the motions to compel arbitration are interlocutory orders. *In re Mirant Corp*., 613 F.3d 584, 588 (5th Cir. 2010). We review the denial of a motion to compel arbitration *de novo*, but we review the district court's factual findings for clear error. *Id*.

---

[4] *Janvey v. Rincon*, No. 3:11-cv-1659, ECF No. 44 (N.D. Tex. Aug. 29, 2014) (order denying motion to compel arbitration). The district court concluded that Rincon had waived his right to arbitration and, in the alternative, concluded that his motion would fail for the same reasons expressed in the Denial Order.

[5] *Janvey v. Giusti*, No. 3:11-cv-292, ECF No. 116 (N.D. Tex. Sept. 23, 2014) (order denying motion to compel arbitration). The district court denied the motion on the grounds expressed in the Denial Order.

[6] *Janvey v. Tonarelli*, No. 3:10-cv-1955, ECF No. 43 (N.D. Tex. Aug. 1, 2014) (order denying motion to dismiss or, in the alternative, to compel arbitration). The district court again denied the motion on the grounds expressed in the Denial Order.

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworks of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). As a result, we analyze whether a party can be compelled to arbitrate using a two-step process. "First, we ask if the party has agreed to arbitrate the dispute." *Sherer v. Green Tree Serv. L.L.C.*, 548 F.3d 379, 381 (5th Cir. 2008). "While there is a strong federal policy favoring arbitration, the policy does not apply to the initial determination whether there is a valid agreement to arbitrate." *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004). If the party opposing arbitration has agreed to arbitrate, "we then ask if 'any federal statute or policy renders the claims nonarbitrable.'" *Sherer*, 548 F.3d at 381 (quoting *JP Morgan Chase & Co. v. Conegie*, 492 F.3d 596, 598 (5th Cir. 2007)).

**III.**

The Receiver argues that he is bringing his claims on behalf of the Bank, which has not agreed to arbitrate with the defendants, except in the case of Giusti. In the alternative, the Receiver argues that the arbitration agreements on which the defendants' motions are based should be rejected as part of the fraudulent scheme, and that his equitable authority as Receiver empowers him to reject executory contracts, including the arbitration clauses. Finally, the Receiver argues there is "an inherent conflict between arbitration and the [federal receiver] statute's underlying purpose" such that federal law does not permit the court to compel arbitration. *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987). The various defendants disagree and also

argue that the district court exceeded the scope of our mandate in *Alguire III* by allowing the Receiver to avoid arbitration.[7]

**A.**

The Receiver first argues that he is free to bring his TUFTA claims on behalf of any of the Stanford entities and that, by bringing the claims on behalf of the Bank, which was not a signatory to the arbitration agreements (except for the agreement with Giusti), he is not bound by the arbitration agreements. The district court disagreed, reasoning that allowing the Receiver to pick the entity on whose behalf he brought the claims "would be inconsistent with [the district court's] previous rulings and inconsistent with equity." Denial Order at 10.[8]

We have previously considered at great length the Receiver's representative role. In *DSCC II* we concluded that the Receiver "has standing to assert the claims of [the Bank], and any other Stanford entity in receivership." 712 F.3d at 192. We clarified, however, that "the knowledge and effects of the fraud of the principal of a Ponzi scheme in making fraudulent conveyances of the funds of the corporations under his evil coercion are not imputed to his captive corporations." *Id.* at 190. Therefore, "once freed of his coercion by the court's appointment of a receiver, the corporations in receivership, through the receiver, may recover assets or funds that the

---

[7] The various defendants have collectively filed ten initial briefs and six reply briefs, and there is substantial overlap in their arguments. Except where otherwise noted, we refer to the defendants collectively without distinguishing between their arguments.

[8] The district court also observed that certain difficulties might arise if the Receiver brought actions on behalf of the Bank, because the Receiver would have to challenge two fraudulent transfers: first, the transfer of funds from the Bank to the Company and, second, the transfer from the Company to the employee-defendants. The district court stated that although TUFTA permits claims against subsequent transferees, Tex. Bus. & Comm. Code § 24.009(b)(2), the Receiver would need to show that the first transfer was fraudulent and would have to do so while representing both sides of the transaction (the Bank and the Company).

principal fraudulently diverted to third parties . . . ." *Id.* We based our decision in that case on the Seventh Circuit's holding in *Scholes* that corporations involved in a fraudulent scheme, although "[the defrauder's] robotic tools, were nevertheless in the eyes of the law separate legal entities with rights and duties." *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995).

*Scholes*, like *DSCC II*, determined that a receiver has standing to sue on behalf of formerly captive corporations and that the corporations, once freed from the control of the scheme's perpetrator, are not barred from recovery by the defense of *in pari delicto*. *Id.* at 754–55; *DSCC II*, 712 F.3d at 191–92. Although these cases do not directly answer our question, their reasoning compels a single outcome. If the corporations retain identities distinct from Stanford himself, as "separate legal entities with rights and duties," it logically follows that they are distinct from one another. *Scholes*, 56 F.3d at 754. Now that Stanford no longer controls the Bank and the Company for the benefit of an integrated criminal scheme, the Bank and the Company are separate actors. The Receiver, appointed by the court to represent all of the Stanford entities, may bring his claim on behalf of whichever of the entities he chooses, provided that the entity has a claim against the defendant in question.

The Receiver has exercised his authority to bring claims on behalf of the Stanford entities individually and argues that he brings his claims against the employee-defendants on behalf of the Bank. The Bank collected deposits from investors. The Receiver alleges that Stanford diverted those deposits from the Bank into the Company and then arranged for the Company to pay the employee-defendants in furtherance of his illegal scheme. These allegations satisfy the requirements of TUFTA, which allows any creditor to reclaim fraudulently transferred assets from the initial transferee (here the Company) or "any subsequent transferee other than a good faith transferee who took for

value." Tex. Bus. & Comm. Code § 24.009. The Bank, which has a "right to payment or property," is a creditor under TUFTA. *Id.* § 24.002(3), (4). TUFTA thus allows the Receiver to bring a claim on behalf of the Bank against the defendants as "subsequent transferee[s]" of the fraudulent transfers.[9]

The Bank is not a signatory to any of the promissory notes apart from Giusti's, nor is it a member or associated person bound to arbitrate under FINRA's rules. Moreover, the references to "affiliates" in the arbitration agreements are insufficient to bind the Bank. *See In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007) ("'A corporate relationship is generally not enough to bind a nonsignatory to an arbitration agreement.' Unlike a corporation and its employees, corporate affiliates are generally created to separate the businesses, liabilities, and contracts of each. Thus, a contract with one corporation—including a contract to arbitrate disputes—is generally not a contract with any other corporate affiliates.") (citations omitted) (declining to allow affiliates referenced in arbitration agreement to compel arbitration in the absence of an "alter-ego exception"). Because the Receiver brings his claims on behalf of the Bank and the Bank has not consented to arbitration, the motions to compel arbitration fail.

The defendants' arguments to the contrary are unavailing. They argue that three different equitable doctrines bind the Bank as a third party to the arbitration agreements between the Company and the defendants: alter ego, estoppel, and third-party beneficiary. These doctrines permit a court to impose

---

[9] *Wiand v. Schneiderman*, 778 F.3d 917 (11th Cir. 2015), on which the defendants rely for the proposition that a receiver cannot avoid arbitration by asserting claims on behalf of non-signatory receivership entities, is distinguishable on this ground. *Wiand* held that where the non-signatory entities had "no relationship at all with [the defendant]," they had no standing to pursue standalone claims against the defendant so as to provide an avenue for vacating an arbitration award. *Id.* at 925. Here, in contrast, the Bank has standing under TUFTA to bring its claims directly against the defendants.

a contract on a third party who is not a signatory to the contract. *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356, 358–63 (5th Cir. 2003). These three doctrines sound in equity. We do not apply equitable principles rigidly, but rather circumspectly, because they are "grounded in fairness . . . . 'In all cases, the lynchpin . . . is equity, and the point of applying it to compel application of a contractual provision is to prevent a situation that would fly in the face of fairness.'" *Bahamas Sales Assoc., L.L.C. v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012) (alterations and citation omitted). None of the three doctrines bind the Bank.

The doctrine of alter ego allows a court to pierce the corporate veil and impose on an owner the obligations of its subsidiary "when their conduct demonstrates a virtual abandonment of separateness." *Bridas*, 345 F.3d at 359 (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777 (2d. Cir. 1995)). "Courts do not lightly pierce the corporate veil even in deference to the strong policy favoring arbitration." *Id.* (quoting *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1461 (10th Cir. 1995)). In prior litigation, we have made clear that the blurring of corporate boundaries and the wrongful acts taken by Stanford no longer equitably affect the hostage corporations now that they are under the control of the Receiver. *See DSCC II*, 712 F.3d at 192. Just as Stanford's removal from the scene vitiated the defendants' defense of *in pari delicto*, so it vitiates their defense of alter ego.

The defendants advance two theories of equitable estoppel, both of which are inapplicable. The "intertwined claims" theory governs motions to compel arbitration when a signatory-plaintiff brings an action against a nonsignatory-defendant asserting claims dependent on a contract that includes an arbitration agreement that the defendant did not sign. *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527–28 (5th Cir. 2000). It does not govern

the present case, where a signatory-defendant seeks to compel arbitration with a nonsignatory-plaintiff. *Bridas*, 345 F.3d at 361. The "direct benefits" theory of equitable estoppel "prevents a nonsignatory from knowingly exploiting an agreement containing the arbitration clause." *Graves v. BP Am., Inc.*, 568 F.3d 221, 223 (5th Cir. 2009). That is, "a nonsignatory cannot sue under an agreement while at the same time avoiding its arbitration clause." *Id.* This theory is inapplicable here because the Receiver does not seek to enforce the various contracts containing the arbitration agreements; rather, he seeks to unwind them and reclaim the benefits fraudulently distributed to the defendants under the contracts.

Finally, the third-party beneficiary doctrine prevents the intended beneficiary of a contract from avoiding the terms of the contract. It does not apply when a person merely is directly affected by the parties' conduct or has a substantial interest in a contract's enforcement. *Bridas*, 345 F.3d at 362. Rather, "[p]arties are presumed to be contracting for themselves only," and a third party is bound only "if the intent to make someone a third-party beneficiary is 'clearly written or evidenced in the contract.'" *Id.* (citing *Fleetwood Ent., Inc. v. Gaskamp*, 280 F.3d 1069, 1075–76 (5th Cir. 2002)). There is no indication in the contracts or promissory notes that the Company and the defendants intended the Bank to be the beneficiary of their agreements. The defendants argue that the inflated commissions paid to them under the contracts benefited the Bank because they induced more creditors to invest in the Bank, but this argument conflates Stanford with his victim corporations. Expanding the number of defrauded investors in the Bank merely expanded the Bank's ultimate liabilities and increased the injury to the Bank; it did not benefit the Bank as a corporate entity distinct from the fraudster, Stanford. *See Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006)

("It takes cheek to contend that in exchange for the payments [an investor and promoter] received, the RDI Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments.").

Because the Receiver may sue on behalf of any of the Stanford entities that has a claim against the defendants, because he has chosen to sue on behalf of the Bank, which has not consented to arbitrate claims against any of the defendants, except Giusti, and because none of the equitable doctrines urged by the defendants applies, the Receiver cannot be compelled to arbitrate his claims against these defendants.

We also conclude, though on different grounds, that the Receiver cannot be compelled to arbitrate its claims against Giusti, who did enter into an agreement to arbitrate with the Bank. [10] A party who has entered into an agreement to arbitrate must insist on this right, lest it be waived. "Under this circuit's precedent, a party waives its right to arbitrate if it (1) substantially invokes the judicial process and (2) thereby causes detriment or prejudice to the other party." *Al Rushaid v. Nat'l Oilwell Varco, Inc.*, 757 F.3d 416, 421 (5th Cir. 2014) (internal quotation marks omitted). While waiver should not be inferred lightly, we conclude that Giusti's conduct in this case clears the waiver threshold. After the Receiver sued Giusti in 2011, Giusti participated in discovery and other pre-trial litigation.[11] Giusti ultimately moved to compel arbitration in 2014, and continued to litigate while that motion was pending.

[10] Though the district court did not resolve Giusti's motion to arbitrate on these grounds, we may affirm the district court on any ground "presented by the parties," even if not "relied on by the [district] court." *See Resolution Performance Prod., LLC v. Paper Allied Indus. Chem. & Energy Workers Int'l Union, Local 4-1201*, 480 F.3d 760, 767 n.20 (5th Cir. 2007); *Bickford v. Int'l Speedway Corp.*, 654 F.2d 1028, 1031 (5th Cir. 1981) (district court may be affirmed "on any grounds, regardless of whether those grounds were used by the district court").

[11] For instance, Giusti moved to dismiss, filed an initial answer and amended answer, sent written discovery, and answered discovery.

*See In re Mirant Corp.*, 613 F.3d at 589–91 (holding that a party substantially invoked the judicial process by, *inter alia*, submitting three motions to dismiss before moving to compel arbitration). One of the primary justifications for enforcement of private dispute resolution is the avoidance of large litigation costs, including discovery. Parties cannot enjoy the benefits of federal discovery, and then, after doing so, seek to enforce a decision through private resolution. We therefore conclude that Giusti substantially invoked the judicial process.

We also conclude that Giusti's participation in the judicial process prejudiced the Bank. *In re Mirant Corp.*, 613 F.3d at 591 ("In addition to invocation of the judicial process, the party opposing arbitration must demonstrate prejudice before we will find a waiver of the right to arbitrate."). Prejudice, in this context, "refers to delay, expense, and damage to a party's legal position." *Id.* It is apparent on the face of the record before us that the Bank was prejudiced, both by delay and increased litigation expenses, as a result of Giusti's decision to litigate for nearly three years before moving to compel arbitration. Therefore, we conclude that Giusti has waived his right to arbitration, and so the Receiver cannot be compelled to arbitrate its claims against him.

Accordingly, we conclude that the Receiver cannot be compelled to arbitrate its claims against any of the defendants.

**B.**

The Receiver also argues that these particular arbitration agreements are additionally unenforceable because they were instruments of the fraud inasmuch as the privacy they provided facilitated the fraud and because the Stanford entities were coerced into accepting them by Stanford as part of his

Ponzi scheme.[12] As a result, the Receiver argues that, under the logic of *DSCC II*, the Company cannot be bound to them now that Stanford is removed from the scene unless the Receiver affirmatively assents to them, and that enforcement of the arbitration agreements would give effect to the very fraud the Receiver is charged with unwinding by diminishing his ability to return fraudulently transferred assets to the creditors. The Receiver makes a strong argument that if we hold that he is bound by the terms of the contracts involved in Stanford's Ponzi scheme, there would be no basis for recovering the funds that were fraudulently transferred to the scheme's net winners pursuant to their employment contracts. We need not reach this issue as we have already determined, on other grounds, that the Receiver cannot be compelled to arbitrate its claims against any of the defendants.

Nor do we reach the Receiver's similar but broader policy argument that the underlying purpose of the federal equity receivership statutes is at odds with the FAA's mandate in favor of arbitration. In support of this alternative basis for denying the motions to compel arbitration, the district court raised important concerns about undermining Congress's goal of consolidating receivership claims before a single court. However, we are wary of endorsing these broad policy arguments in the absence of specific direction from the Supreme Court. *Cf., e.g.*, *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 471

---

[12] The defendants counter that the validity of the arbitration clause is a question for the arbitrator because "where parties have formed an agreement which contains an arbitration clause, any attempt to dissolve that agreement by having the entire agreement declared voidable or void is for the arbitrator." *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003). However, the Receiver does not, at this stage, argue that the entirety of the contracts between the employee-defendants and the Company are void. Although he will undoubtedly argue that proposition as part of the litigation on the merits, at the moment he merely argues that arbitration provisions, standing on their own as severable provisions of the contract, are void. "[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

(2015) (rejecting interpretation of law that "does not give 'due regard . . . to the federal policy favoring arbitration'") (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989)).[13]

**C.**

Finally, we reject the arguments raised by some of the defendants that the district court's order exceeded the scope of our mandate in *Alguire III*. "We review *de novo* a district court's application of the remand order, including whether the law-of-the-case doctrine or mandate rule forecloses the district court's actions on remand." *United States v. Teel*, 691 F.3d 578, 583 (5th Cir. 2012) (citation omitted).

In *Alguire III*, we stated:

> On appeal, the parties have focused primarily on whether the Receiver has standing to sue on behalf of creditors and not on whether he is bound by the arbitration clauses if he sues, as he must, on behalf of the Stanford Entities. The district court did not address this issue. We therefore remand to allow the district court to consider that question in the first instance.

539 F. App'x at 480. Whether the Receiver is bound by the arbitration clauses if he sues on behalf of the Stanford entities (which includes the Bank) is precisely the question argued by the Receiver and answered by the district court, according to our instruction. We see no violation of the mandate rule.

Nor has the Receiver waived his arguments raised for the first time in the district court, because those arguments were made in response to our mandate that the district court consider a new issue in the first instance. Moreover, the reason for the remand in *Alguire III* was that *DSCC II* effected an intervening change in the law governing the Receiver's standing to sue on

[13] Likewise, we do not reach the parties' various other arguments, such as whether some of the defendants have waived their right to arbitration or whether Giusti's arbitration clause is unreasonable, as these issues are moot in light of our holdings here.

behalf of non-receivership entities. Before *DSCC II*, there was no need for the Receiver to raise his current arguments as to why, when suing on behalf of the receivership entities, he is not bound by the arbitration agreements. Under these circumstances, the Receiver properly raised new arguments to address the new question before the district court.[14]

**IV.**

Because the Receiver properly brings his TUFTA claims on behalf of the Stanford International Bank, which did not consent to arbitration with any of the defendant employees, other than Giusti, it cannot be compelled to arbitrate with those defendants. Moreover, because Giusti waived his right to arbitration, the Receiver cannot be compelled to arbitrate its claims against him either. Accordingly, we AFFIRM the district court's denial of the defendants' motions to compel arbitration.

---

[14] We also agree with the district court that the Receiver is not estopped from contesting the arbitrability of his claims against defendants Charles Rawl and Mark Tidwell. As the district court noted, although Stanford Group Company initiated arbitration proceedings against Rawl and Tidwell, that arbitration occurred before the appointment of the Receiver and involved claims and issues wholly distinct from those in the instant case.

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring:

I concur in the majority opinion but write separately to state what is, to these eyes, a more fundamental reason that the arbitration clauses in this case are not enforceable. Simply put, arbitration agreements may be rejected when they are instruments of a criminal enterprise, as these arbitration agreements were. The Federal Arbitration Act ("FAA") evinces Congress's desire to enforce arbitration agreements,[1] an expression warmly embraced by the judiciary. But, there are limits. Those limits here control.

I write against an informing backdrop of a decision of the Court of Exchequer nearly 300 years ago. In the 1725 case of *Everet v. Williams*, also known as the *Highwayman's Case*,[2] highwaymen Everet and Williams entered into a partnership to share robbery proceeds. They took their dispute over the proper division of their booty to court, filing a Bill in Equity at the Court of Exchequer. The court considered the Bill to be "scandalous and impertinent."[3] Both Everet and Williams were arrested and hanged. Counsel were punished with costs and one was sentenced to hang, but was ultimately banished.[4] The present case concerns the proper division of illegally procured booty from victims of a criminal enterprise—over $200 million, payable but frozen in accounts of sales persons of the enterprise, some having earned in excess of $2 million for their role in the scheme. In short, we have in judicial control over $200 million in booty, undisputed to be proceeds from the criminal scheme.

[1] *See Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2308–09 (2013); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344–46 (2011).

[2] 9 L.Q. Rev. 197 (1893).

[3] *U.S. S.E.C. v. Lyttle*, 538 F.3d 601, 605 (7th Cir. 2008).

[4] *See id.*; *Thomas v. UBS AG*, 706 F.3d 846, 851 (7th Cir. 2013).

This case is only one of many attempting to sift the ruins of Allen Stanford's massive Ponzi scheme,[5] a simply constructed vintage fraud. "[A] Ponzi scheme is one where the 'swindler uses money from later victims to pay earlier victims.'"[6] Its name derives from Charles Ponzi, whose fraud the Supreme Court described almost a century ago:

> In December, 1919, with a capital of $150, [Charles Ponzi] began the business of borrowing money on his promissory notes. He did not profess to receive money for investment for account of the lender. He borrowed the money on his credit only. He spread the false tale that on his own account he was engaged in buying international postal coupons in foreign countries and selling them in other countries at 100 per cent. profit, and that this was made possible by the excessive differences in the rates of exchange following the war. He was willing, he said, to give others the opportunity to share with him this profit. By a written promise in 90 days to pay them $150 for every $100 loaned, he induced thousands to lend him . . . Within eight months he took in $9,582,000, for which he issued his notes for $14,374,000. He paid his agents a commission of 10 per cent. With the 50 per cent. promised to lenders, every loan paid in full with the profit would cost him 60 per cent. He was always insolvent, and became daily more so, the more his business succeeded. He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.[7]

At its core, a Ponzi scheme must have in its operation the ability to lull an investor by assuring payments from money of later investors, as there are few if any funds being generated by management of their investments. Its

---

[5] *See United States v. Stanford*, 805 F.3d 557, 564 (5th Cir. 2015), *cert. denied*, 137 S. Ct. 491 (2016); *Zelaya v. United States*, 781 F.3d 1315, 1318 (11th Cir. 2015) (describing Stanford's scheme as "one of the largest Ponzi schemes in American history").

[6] *Stanford*, 805 F.3d at 564 n.1 (quoting *United States v. Murray*, 648 F.3d 251, 256 (5th Cir. 2011)).

[7] *Cunningham v. Brown*, 265 U.S. 1, 7–8 (1924). Ponzi was apparently not the first to come up with such a scheme. *See* CHARLES DICKENS, THE LIFE AND ADVENTURES OF MARTIN CHUZZLEWIT (1844).

essence is to present an air of legitimacy, while simultaneously masking the source of the "return on investment," a reality that must not be exposed—to borrow from Gertrude Stein, that "there is no there there."[8] To this end, arbitration is a valuable tool. Arbitration helps ensure that the occasional dispute with an investor or employee remains private.

Arbitration as we presently know it was built on a bedrock interest of autonomy and its correlative, privacy. That interest has persisted.[9] The Supreme Court has accepted privacy as an expectation, if not an essential, of arbitration,[10] as has this Court.[11] In *Stolt-Nielsen S.A. v. AnimalFeeds International Corporation*, for example, the Supreme Court considered "whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent with the [FAA]."[12] In finding that class arbitration in such instances was inconsistent with the FAA,[13] Justice Alito described some "fundamental changes" between bilateral and class-action arbitration.[14] Notably, citing the Amicus Brief for the American Arbitration Association, Justice Alito explained, "[u]nder the Class Rules, 'the presumption of privacy and confidentiality' that applies in many bilateral arbitrations 'shall not apply in class arbitrations,' thus potentially frustrating the parties' assumptions when they agreed to arbitrate."[15] One year later in *AT&T Mobility*, Justice Scalia echoed the observation of arbitration's confidential

---

[8] EVERYBODY'S AUTOBIOGRAPHY (1937).

[9] *See* Judith Resnik, *Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights*, 124 YALE L.J. 2804, 2894–95 (2015).

[10] *See AT&T Mobility*, 563 U.S. at 348.

[11] *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 175 (5th Cir. 2004) ("[T]he plaintiffs' attack on the confidentiality provision is, in part, an attack on the character of arbitration itself.").

[12] 559 U.S. 662, 666 (2010).

[13] *See id.* at 684.

[14] *Id.* at 686.

[15] *Id.* (citation omitted).

nature. In concluding that class arbitration was inconsistent with the FAA, Justice Scalia pointed out differences between bilateral arbitration and class-action arbitration.[16] For one, "[c]onfidentiality becomes more difficult."[17] Such sentiments not only acknowledge confidentiality as a bargained-for virtue of arbitration, but also bring a judicial view that it is to be protected.

One thus understands why the operator of a Ponzi scheme would be attracted to arbitration. A single lawsuit—even one unrelated to the scheme—may, by the discovery process of a state or federal court, expose the source of an "investor's return"—the fraud. Swindlers can use arbitration to mitigate discovery and cabin attending risk of exposing fraudulent activity while presenting arbitration, not as a tool of fraud, but as business as usual. In short, arbitration can assume a not insignificant role in protecting defendants' privacy,[18] as we will see it did here.

"Stanford created and owned a network of entities . . . that sold certificates of deposit ("CDs") to investors through the Stanford International Bank, Ltd."[19] "When the scheme collapsed in early 2009, the Stanford entities had raised over $7 billion from sales of fraudulent CDs."[20] At the SEC's request, the court appointed Ralph Janvey "as receiver over Stanford, his associates, his corporations, and their assets."[21] The Receiver, standing in the shoes of the Stanford entities,[22] sued the employees, e.g., brokers, of the various Stanford entities to recover assets like salaries and bonuses earned

---

[16] *AT&T Mobility*, 563 U.S. at 347–48.

[17] *Id.* at 348.

[18] *See generally* Resnik, *supra* note 9, at 2894–96 (discussing real and perceived privacy in arbitration).

[19] *Janvey v. Brown*, 767 F.3d 430, 433 (5th Cir. 2014) (citation omitted).

[20] *Id.* (citation omitted).

[21] *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 189 (5th Cir. 2013) [hereinafter *DSCC II*].

[22] *Janvey v. Alguire*, 539 F. App'x 478, 480 (5th Cir. 2013) (unpublished).

from the scheme. Those employee-defendants object, claiming that the Receiver is required to arbitrate. Simply stated, the employee-defendants, Appellants here, had contracts containing arbitration clauses with Stanford entities. The employee-defendants argue that, since the Receiver stands in the shoes of the Stanford entities, he is bound to arbitrate as per their contracts with those entities. The Receiver disagrees, mounting a variety of attacks, including that "[t]he agreements were part of the fraud and coerced by the principals," and "[h]olding that the Entities remain bound to these agreements when represented by the Receiver is illogical and fundamentally at odds with the holding of *DSCC II*." I agree.

The general principles of arbitration are easily stated, more so than applied. That an arbitration clause be treated as a contract distinct from the contract in which it appears is essential to forcing resolution of a dispute to arbitration.[23] Said differently, arbitration clauses are severable from the contracts they are contained within, and any resistance to arbitration must target the arbitration clause itself.[24] As the Court embraced arbitration, *Prima Paint* followed as night from day, holding that a claim of fraud in the inducement and fraud on the contract do not vitiate the independent arbitration clause.[25] Indeed, mine-run assertions of fraud and failed performance of contractual promises will seldom touch the arbitration clause, and the full case will proceed to arbitration. But *Prima Paint* also drew a line: although "claims of fraud in the inducement of the contract generally" must be

---

[23] *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.").

[24] *Id.* at 445–46; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010).

[25] *See Prima Paint Corp.*, 388 U.S. at 404.

arbitrated, claims of "fraud in the inducement of the arbitration clause itself" may be litigated.[26] In my opinion, the latter category encompasses an arbitration agreement used as an instrument of a criminal enterprise.

While the Supreme Court continues to staunchly enforce arbitration to resolve disputes arising from contracts with arbitration clauses, it has not faded the *Prima Paint* boundary. The Supreme Court has long enforced agreements to arbitrate statutory claims,[27] including claims under § 10(b) of the Securities Exchange Act of 1934 and claims under the Racketeer Influenced and Corrupt Organizations Act (RICO).[28] And, citing § 2 of the FAA,[29] it has reaffirmed that the FAA's "saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,'" but, it has noted, "not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."[30] In *American Express Co. v. Italian Colors*

---

[26] *Id.* at 403–04; *accord Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985) ("[C]ourts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" (citations omitted)).

[27] *See Mitsubishi Motors Corp.*, 473 U.S. at 626–27.

[28] *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 222, 238, 242 (1987).

[29] *AT&T Mobility*, 563 U.S. at 339 ("'A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" (quoting 9 U.S.C. § 2)).

[30] *Id.* at 339–40 (citations omitted). That arbitration agreements are instruments of a fraudulent scheme is not an arbitration-specific defense. Any contract employed as an instrument of a fraudulent scheme would similarly be invalid. In any event, the cases cited by the Court evidence its concern for state laws targeting arbitration clauses. *E.g.*, *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 683 (1996) (holding "that Montana's first-page notice requirement, which governs not 'any contract,' but specifically and solely contracts 'subject to arbitration,' conflicts with the FAA and is therefore displaced by the federal measure.").

*Restaurant*,[31] the Supreme Court enforced a waiver of class arbitration against merchants suing American Express for a Sherman Act violation,[32] even though the cost of proving such a claim would far exceed the potential recovery for any individual plaintiff.[33] The Court found that "[n]o contrary congressional command,"—the antitrust laws or Rule 23—required it "to reject the waiver of class arbitration."[34] It also considered and rejected the "effective vindication" exception to the FAA.[35] "[T]he exception finds its origin in the desire to prevent 'prospective waiver of a party's *right to pursue* statutory remedies,'"[36] the Court reasoned, "[b]ut the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy."[37] These cases demonstrate the Court's firm defense of arbitration, but do not suggest that when arbitration has been used as an instrument in fraud itself, arbitration should nevertheless be enforced.[38]

---

[31] 133 S. Ct. 2304 (2013).

[32] *Id.* at 2308 ("According to respondents, American Express used its monopoly power in the market for charge cards to force merchants to accept credit cards at rates approximately 30% higher than the fees for competing credit cards. This tying arrangement, respondents said, violated § 1 of the Sherman Act." (footnote omitted)).

[33] *Id.* at 2316 (Kagan, J., dissenting) ("Italian Colors could take home up to $38,549. But a problem looms. As this case comes to us, the evidence shows that Italian Colors cannot prevail in arbitration without an economic analysis defining the relevant markets, establishing Amex's monopoly power, showing anticompetitive effects, and measuring damages. And that expert report would cost between several hundred thousand and one million dollars." (footnote omitted)).

[34] *Id.* at 2309 (majority opinion).

[35] *Id.* at 2310 ("The 'effective vindication' exception to which respondents allude originated as dictum in *Mitsubishi Motors*, where we expressed a willingness to invalidate, on 'public policy' grounds, arbitration agreements that 'operat[e] ... as a prospective waiver of a party's right to pursue statutory remedies.'" (citation omitted)).

[36] *Id.* (citation omitted).

[37] *Id.* at 2311 (citation omitted).

[38] *Id.* at 2312 (2013) (Thomas, J., concurring) ("[T]he FAA requires that an agreement to arbitrate be enforced unless a party successfully challenges the formation of the arbitration agreement, such as by proving fraud or duress." (citation and quotation marks omitted)).

I am persuaded that the Receiver—standing in the shoes of the Stanford entities—is not bound by the arbitration agreements because those agreements were instruments of Stanford's fraud. Stanford and his co-conspirators exercised complete control over the receivership entities before the scheme collapsed,[39] and that control included the agreements to arbitrate, which were part of the contracts that had to be signed by the entities.[40] The arbitration agreements were central to the Stanford Ponzi scheme with its inherent need for privacy. As part of their employment contracts, the brokers fed the enterprise by the ongoing sale of CDs, for which they were handsomely compensated. Perversely, some employee-defendants claim they were deceived by the Ponzi scheme, yet the privacy of arbitration helped keep it hidden. The arbitration clauses, including their ostensible compliance with FINRA rules, perpetuated the Ponzi scheme by shielding the fraudulent activity from potentially revealing discovery while giving the scheme an air of legitimacy.[41] It signifies that a Ponzi scheme is extrinsic to the enforcement of promises of contracts that only in aggregation become illegal. This case does not present single inducement claims upon distinct contracts, rather it presents the claims

[39] *See Brown*, 767 F.3d at 437–39; *DSCC II*, 712 F.3d at 193 ("Because the Stanford corporations were the robotic tools of Stanford's Ponzi scheme, knowledge of the fraud could not be imputed to them while they were under Stanford's coercion."); *id.* at 198 (concluding "that the evidence presented to the district court overwhelmingly established that, from at least as early as 1999, the Stanford corporations were nothing more than robotic tools of Stanford's elaborate Ponzi scheme").

[40] Because this Court has embraced the principles in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), *see Brown*, 767 F.3d at 437; *DSCC II*, 712 F.3d at 190–92, the receivership entities are not responsible for actions directed by Allen Stanford to perpetuate the fraudulent Ponzi scheme.

[41] Granted, there are exceptions to the general privacy afforded in arbitration. *See* Resnik, *supra* note 9, at 2896–97. For instance, FINRA rules require arbitration awards to be publicly available. FINRA Rules 12904(h), 13904(h). Nevertheless, the basic disputes remain concealed.

of many swept into the vortex of a criminal enterprise collectively providing its fuel of new investors.

One lesson of the *Highwayman's Case* is that efforts to enforce contracts in service of criminal enterprise ought receive a cold reception in the courts. Surely we would not enforce an arbitration clause in the agreement between Everet and Williams. Their autonomous right to dial out of the sovereign's courts to frustrate its criminal law ought be no more enforceable than the court's direct enforcement of their agreements to share the booty—at the least when its felonious nature has been established by conviction of the architect of the criminal scheme.

It is oft-repeated that "[t]he FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements."[42] Since then, dispelling any notion of lingering hostility, courts have steadily increased their defense of arbitration, posing the question of its limits. I offer no new limit and break no new legal ground. There are outer boundaries to the enforcement of arbitration agreements, and they surely hit shoal water as they encounter the criminal enterprise, the existence of which here has been judicially determined and for which its principals have been convicted and sent to prison.[43]

Privacy remains a significant attractant to arbitration even as the cost of arbitration approaches that of litigation. In a Ponzi scheme, covering the eyes and ears of lulled investors by using arbitration, with its obstruction of the powerful discovery process of federal courts, mitigates the risks of a torch in a hay barn where a hot ember can take it down. It is no accident that even promissory notes with the sales personnel contained arbitration provisions. Here, the risk of discovery is so high as to pull the arbitration clause to the

---

[42] *AT&T Mobility*, 563 U.S. at 339; *accord Am. Express Co.*, 133 S. Ct. at 2308–09.
[43] *Stanford*, 805 F.3d at 563; *DSCC II*, 712 F.3d at 189.

heart of the criminal enterprise and from the bite of *Prima Paint*. This is not to gainsay the strong support of arbitration by the Congress and the courts. Rather, refusing to enforce arbitration provisions deployed in service of an illegal scheme travels with and reinforces this foundational support—a friend, not an enemy, of arbitration.